CHANDLER, Justice,
for the Court.
¶ 1. Caleb Corrothers was convicted of two counts of capital murder, with the underlying felony of robbery, for the murders of Frank Clark and Taylor Clark. He was convicted on a third count of aggravated assault for the shooting of Tonya Clark. The jury sentenced Corrothers to death for the two counts of capital murder and to life imprisonment without the possibility of parole for the aggravated assault. The trial court denied Corrothers’s post-trial motions. He now appeals. We find no error and affirm Corrothers’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
¶ 2. Taylor Clark, a twenty-year-old white male, was the youngest son of Frank and Tonya Clark. Known as an outgoing individual, Taylor was generally liked by everyone; however, trial evidence indicated that he was known throughout his community to sell marijuana “from time to time.” According to the evidence, he usually carried four to five hundred dollars on him.
¶ 3. On the night of July 11, 2009, Taylor dropped off his girlfriend at her house around 9:00 p.m. and told her he was going home. Rather than going directly home, he went to Karen Hickinbot-tom’s house at 2516 University Avenue. Hickinbottom was a friend of Taylor’s and the girlfriend of his marijuana dealer. Karen testified at trial that Taylor stopped by her house around 9:00 p.m. on July 11, to return a cell phone belonging to her boyfriend, which he had left in Taylor’s car earlier that day.
¶ 4. Karen had known Taylor for about a year, and she bought marijuana from him. Taylor was talking with Karen and her daughter when Karen’s son came home and said that someone outside wanted to talk to Taylor. Taylor went outside, then came back in and said it was someone who wanted to buy drugs. The man outside came to the door a few minutes later, demanding to talk to Taylor again. Karen testified that Taylor went outside again to talk to the man, then came back in and said “Man, I got to get out of here.” Karen saw the man get in the passenger seat of Taylor’s car, and they drove off. She said they left her house between 9:30 p.m. and 10:30 p.m. Karen would later describe the man who left with Taylor as a “6 foot to 6'2" black male, medium build, very low cut hair.”
*289 ¶ 5. Sometime after 11:00 p.m. on the night of July 11, 2009, Taylor pulled up to his family’s home, jumped out of his car, and ran into the house. An armed man got out of the passenger side of Taylor’s car and chased Taylor toward the house. Taylor’s older brother, Josh, was standing outside smoking a cigarette. Josh had suffered significant physical injuries in two recent car accidents, and he was barely able to walk without assistance. Taylor’s parents, Frank and Tonya, were in the house asleep. Taylor ran into the house screaming to wake his parents, saying that a man was “fixing to kill Josh.”
¶ 6. Frank ran from his bedroom to aid Taylor and attempted to hold the door shut to prevent the man from entering the house. The man shot through the door, then reached his arm around the door, shooting and killing Frank. The man was then able to enter the house. He shot Tonya twice in the neck, and Taylor came running to attack the man. He shot Taylor twice, killing him. Tonya testified that the man then went to her bedroom, got a rifle from her husband’s collection, returned to the living room, and pointed the gun at her. When he realized that the rifle was not loaded, he wiped it off with a rug and threw the gun and the rug down.
¶ 7. The man then turned on Josh, who had entered the house and retreated to his bedroom. The man threatened Josh and demanded to know “where the money was.” Tonya was able to get to Josh’s room and force herself between Josh and the attacker. The man demanded money and car keys. Tonya gave him all the money she had in her purse — about $50— and the spare keys to Taylor’s car, a white Crown Victoria. The man left the house and approached a car in the driveway. Tonya followed him out of the house, asking why he had done this. The man claimed that Taylor owed him $5,000. He attempted to use the keys to get into the wrong car, and Tonya yelled at him that the keys went to the Crown Victoria. The man got into the car and drove off, going left out of the Clarks’ driveway, down a dead-end road. Tonya dialed 911 before he was out of the driveway. Tonya’s call was received at 11:38 p.m.
¶ 8. When police arrived, they found Taylor’s car abandoned down the road from the Clarks’ driveway. The car was left running and the driver-side door was open. Police searched the car, revealing a F.I.E. brand .38 caliber revolver with six spent shell casings in it. No fingerprints were found on the weapon, in the house, or in the car that would aid in identifying the attacker, nor was forensic or DNA evidence found that would link a suspect to the crime. Soon after the car was found, a police K-9 unit searched the wooded area surrounding the car to no avail.
¶ 9. Around 4:15 a.m. on July 12, 2009, approximately four and half hours after the attacker had left the Clarks’ house, Taylor Windham was walking in Grand Oaks neighborhood near Majestic Oaks Drive as he did nearly every morning at that time. A thickly wooded area covering approximately two miles separated Grand Oaks from the Clarks’ house. While on his morning walk, Windham noticed a shirtless man approaching him. According to Windham, the man said that he had been jumped and that he was lost. He asked where the neighborhood was and asked for directions to Highway 7. Wind-ham pointed him in the direction of the highway. He described the man as approximately five feet, ten inches tall, slim but muscular, and wearing baggy pants but no shirt. Windham then hid in a neighbor’s driveway and watched the man walk toward the intersection of Highway 7 and Belk Boulevard.
*290 ¶ 10. At 4:53 a.m., a shirtless man, covered in scratches, entered a Kangaroo Express gas station on Belk Boulevard. Kevin Maxey was working at that time, and the man told Maxey that he had been jumped by six people. The man used the phone to make two phone calls, but he did not get an answer. The man asked to borrow a shirt, but Maxey did not give him one. He then bought cigarettes, a lighter, juice, and cinnamon rolls, and paid with cash. Maxey testified at trial that the man did not seem nervous or scared and did not act like someone who had just been jumped. At the time, Maxey thought the man was attempting to call the police. The gas-station security camera captured most of the exchange. The video clearly shows an African-American man wearing baggy pants and no shirt. Maxey also testified that the man had scratches all over him; however, the scratches do not clearly appear in the video.
¶ 11. Police identified the man in the gas-station surveillance video as Caleb Corrothers and compiled a six-person photo lineup that included Corrothers’s photo. They showed the lineup to Tonya and Josh at the funeral home during the visitation for Frank and Taylor, five days after the murders. Tonya and Josh were shown the lineup separately. Tonya could not identify the attacker from the photo lineup, but Josh identified Corrothers as the attacker. A search warrant was issued for Corroth-ers’s arrest. Corrothers turned himself in to police after learning of the warrant. Investigator Scott Mills testified that, when Corrothers came to the police station, he had scratches on his face, head, and body, band-aids on his head, and an injury to his left thigh. Investigator Mills’s testimony was corroborated with photographs taken of Corrothers when he arrived at the police station.
¶ 12. Corrothers gave a statement to police, which was recorded, but he denied any involvement in the murders. At the beginning of the recorded interrogation, Investigator Mills read Corrothers his Miranda[1] rights. When asked if he knew Taylor, Corrothers said that he had bought marijuana from Taylor in May at a house near Tammy’s Salon. Tammy’s Salon is located down the road from Karen Hickin-bottom’s house on University Avenue. Corrothers told Investigator Mills a colorful story about his whereabouts on the night of murders.
¶ 18. Corrothers said that on the night of July 11, he left his mother’s home in the Brittany Woods subdivision and went to the Field, which is a building off Highway 6 East that is rented out for parties. He went to the Field with a man from Memphis named Suave. While there, Suave approached Corrothers about smoking marijuana. The two drove out into the county to smoke, when, for reasons unknown, Suave attacked Corrothers. Suave pulled out a gun, but Corrothers grabbed the gun and disarmed him; at some point, the gun discharged and grazed Corroth-ers’s left thigh. Corrothers’s friend, Cortez, arrived just in time to rescue him, and the two drove away in his blue Nissan Maxima. Cortez drove Corrothers to Caroline Redmond’s house in Brittany Woods. After stopping at Redmond’s house, Corrothers returned to his mother’s home and went to bed around 10:30 p.m. that night. According to Corrothers, he slept until roughly 10:00 a.m. Sunday morning. Corrothers said that the pants he was wearing that night would still be at his mother’s house, but police never found the pants after issuing a search warrant. Police spoke with Cortez and Redmond, but neither verified Corrothers’s story.
*291 ¶ 14. A grand jury indicted Corrothers on two counts of capital murder, with the underlying felony of robbery, for the murders of Frank and Taylor. He was indicted on a third count of aggravated assault for the shooting of Tonya. Authorities charged Corrothers as a habitual offender. At trial, the jury heard testimony from Josh Clark, Tonya Clark, Karen Hickin-bottom, Taylor Windham, and Investigator Scott Mills. Josh and Tonya identified Corrothers in court as the shooter. Hick-inbottom identified Corrothers in court as the man who came to her door and left her house with Taylor the night of the murders.
¶ 15. The jury also heard from Tiffany Hutchins, who testified that Corrothers came to her house on July 13, 2009, to see her boyfriend, Frederick Holmes. Although Hutchins did not hear the entire conversation, she understood that Corroth-ers told Holmes that he had killed someone. Holmes also testified at trial. He testified that when Corrothers arrived at Hutchins’s house he was covered in scratches, had band-aids on him, and appeared to be in shock. Holmes testified that Corrothers said he had “killed these white folks.” Holmes testified that Cor-rothers said he met up with Taylor and “was trying to get him a lick,” meaning a large amount of money. Holmes asked Corrothers what happened, and Corroth-ers recounted the following story: Cor-rothers met up with Taylor to buy drugs, then he got in the car with Taylor, pointed the gun at him, and made him drive to his house. When they got to the house, Taylor jumped out of the car and ran toward the house. Corrothers chased him, and when he got to the door, he shot through the door, hitting Taylor’s father. He went inside and shot the mother. Corrothers and Taylor started “tousling,” and Cor-rothers’s gun went off and grazed his own leg. Then he shot Taylor twice. Corroth-ers grabbed a set of car keys and left, but he wrecked the car and took off running through the woods.
¶ 16. Holmes did not initially report Corrothers’s story to the police. Holmes was arrested for burglary sometime later and, at that time, he thought it beneficial to tell the police what Corrothers had told him. Holmes agreed to talk to the police about Corrothers, and police agreed to take his “truthful testimony” into consideration regarding the burglary charges. Holmes was out on bond when he testified at trial. Rawson Jannice, who had been incarcerated with Holmes at the Lafayette County Sheriff’s Department, testified for the defense to rebut Holmes’s testimony. Jannice testified that Holmes had told him that he was “going to lie on Mr. Corroth-ers” to get a deal. Corrothers did not testify at trial.
¶ 17. The defense attempted to call Dr. Jeffery Neuschatz, a cognitive psychologist, as an expert in memory and cognition related to eyewitness identification. The State objected, and the trial court did not permit Dr. Neuschatz to testify but allowed a proffer of his testimony outside the presence of the jury. Dr. Neuschatz would have testified about the psychological factors that affect the accuracy of eyewitness identifications and safeguards employed when administering photo lineups.
¶ 18. After both parties gave closing arguments, the jury deliberated for two hours and returned with a guilty verdict on all counts. The following day, the court conducted the sentencing portion of the trial. Tonya testified for the State as to the impact of the crime on her family. Corrothers’s former parole officer testified to his past sentencing for armed robbery. The jury heard from several witnesses in mitigation — Corrothers’s mother, brother, aunt, middle-school teacher, and a family *292 friend — who all testified to his poor upbringing, his being raised by his mother, and his lack of a father figure. The jury also heard from an expert witness, Dr. Joseph Angelillo, a clinical psychologist who had examined Corrothers. Dr. Angel-illo had given Corrothers an intelligence test, an achievement test, and various personality tests. Corrothers’s test results were within the average range for intelligence and in the ninety-fourth percentile on the achievement test. Dr. Angelillo described Corrothers as rebellious, cocky, a poor problem-solver, and testified that he might act out in anger “when cornered.”
¶ 19. The jury sentenced Corrothers to death on both counts of capital murder. The jury found four aggravating factors: (1) Corrothers committed the capital offense while under sentence of imprisonment; [2] (2) Corrothers previously was convicted of a felony involving the use or threat of violence; (3) Corrothers created a great risk of death to many persons; and (4) the capital offense was committed while in the commission of a robbery. He received a sentence of life without parole for the aggravated assault. Corrothers appeals the convictions and sentences.
ISSUES
¶ 20. Twelve issues were enumerated in the original appellant’s brief filed by Cor-rothers’s attorneys:
1.Whether the trial court abused its discretion and erred as a matter of law in excluding the scientifically based testimony of a psychologist with expertise in memory and cognition concerning the reliability of eyewitness identification procedures and testimony in this case.
2. Whether the trial court erred in neither excluding in-court identification of Corrothers nor admitting expert testimony when the evidence established that the in-court identifications were tainted by improper pretrial identification procedures.
3. Whether the trial court exacerbated the foregoing errors and committed independently reversible error in its instructions to the jury at the culpability phase.
4. Whether Corrothers’s conviction must be reversed due to unconstitutional racial discrimination by the prosecution in the jury selection process and other jury selection errors by the trial court.
5. Whether reversal is required for the erroneous and unconstitutional evidentiary rulings at the culpability phases of the trial.
6. Whether Corrothers’s sentence must be vacated because of the trial court’s failure to adequately instruct the jury before the overnight break between the verdict of guilt and the sentencing phase proceedings.
7. Whether Corrothers’s sentence must be vacated because the State presented victim impact testimony in violation of the Eighth and Fourteenth Amendments of the United States Constitution.
8. Whether the trial court erred in refusing Corrothers’s proposed penalty phase instructions.
9. Whether all of the aggravating circumstances on which the jury was instructed were either legally or *293 factually unsupported, and Cor-rothers’s death sentence is therefore invalid.
10. Whether the death sentence in this case must be vacated because it was imposed in violation of the Constitution of the United States.
11. Whether the death sentence in this matter is constitutionally and statutorily disproportionate.
12. Whether the cumulative effect of the errors in the trial court mandates reversal of the verdict of guilt or sentence of death entered pursuant to it.
We have restated or combined several of Corrothers’s issues for the purposes of this opinion. Also, Corrothers filed a supplemental brief, pro se, in which he identified the following additional issues:
1. Whether the trial court erred by allowing Tonya Clark to make in-court identification, which was not consistent with pretrial identification.
2. Whether the trial court made reversible error by allowing the jury to hear only half of Corrothers’s audio statement.
3. Whether the trial court made plain error in allowing Detective Scott Mills to give fabricated testimony that violates the chain of custody of his investigation and discredits the State’s theory of the ease.
Corrothers’s pro se issues are akin to su-bissues of the issues articulated by his attorneys, and they will be discussed under the framework of the original twelve issues.
STANDARD OF REVIEW
¶ 21. We apply a standard of “heightened scrutiny” when reviewing capital-murder convictions where the accused has been sentenced to death. Batiste v. State, 121 So.3d 808, 828 (Miss.2018) (quoting Fulgham v. State, 46 So.3d 315, 322 (Miss.2010)). “[A]ll doubts are to be resolved in favor of the accused because ‘what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.’ ” Batiste, 121 So.3d at 829 (quoting Moffett v. State, 49 So.3d 1073,1079 (Miss.2010)).
LAW AND ANALYSIS
I. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW IN EXCLUDING THE TESTIMONY OF DR. NEUSCHATZ CONCERNING THE RELIABILITY OF EYEWITNESS IDENTIFICATION PROCEDURES AND TESTIMONY AND PHOTOGRAPHIC LINEUPS IN THIS CASE.
¶22. The defense filed a pretrial motion to determine the admissibility of testimony by Dr. Jeffrey Neuschatz, a cognitive psychologist, as an expert in memory and cognition related to eyewitness identification. Dr. Neuschatz has a Ph.D. degree in cognitive psychology and is a tenured professor at the University of Alabama at Huntsville. He has performed research and authored studies in the field of eyewitness identification. The State objected to Dr. Neuschatz’s expert testimony, arguing that his proffered testimony did not rely on proven scientific principles, that it was not generally accepted, and that it would not assist the jury. The trial court heard the motion during the trial and excluded Dr. Neuschatz’s testimony. Corrothers argues that the ruling was an abuse of discretion because Dr. Neus-chatz’s conclusions were admissible under Mississippi Rule of Evidence 702. Cor-rothers further argues that the exclusion was prejudicial because the State’s case *294 relied almost exclusively on the eyewitness identifications made by Tonya and Josh.
¶ 23. We begin by clarifying that Corrothers’s proffer of Dr. Neuschatz’s testimony was limited to Josh’s eyewitness identification. Because Tonya never made a pretrial identification, Corrothers’s pretrial motion to determine the admissibility of Dr. Neuschatz’s testimony pertained solely to Josh’s identification. At the trial, both Tonya and Josh made in-court identifications of Corrothers. The Daubert hearing on Dr. Neuschatz occurred after their testimony. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). At the hearing, Corrothers argued that Dr. Nues-chatz would assist the jury in determining the reliability of Josh’s identification, and Dr. Neuschatz’s proffer pertained solely to Josh’s identification. The trial court recognized in its exclusionary ruling that Dr. Neuschatz’s testimony pertained solely to Josh’s credibility. On appeal, Corrothers argues that Dr. Neuschatz’s testimony challenged Tonya’s credibility, in addition to Josh’s. But because Dr. Neuschatz’s proffer was limited to challenging Josh’s identification, this argument is procedurally barred. Havard v. State, 94 So.3d 229, 239 (Miss.2012) (an issue not raised before the trial court is procedurally barred).
¶ 24. We turn to the admissibility of Dr. Neuschatz’s testimony. Expert testimony admitted at trial must meet the requirements of Rule 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
M.R.E. 702. Rule 702 requires expert testimony to be both relevant and reliable. Denham v. Holmes ex rel. Holmes, 60 So.3d 773, 784 (Miss.2011) (citing Daubert, 509 U.S. 579, 113 S.Ct. 2786). The relevance prong requires that the evidence “assist the trier of fact to understand the evidence or to determine a fact in issue.” Daubert, 509 U.S. at 591, 113 S.Ct. 2786. Evidence not relating to an issue in the case is not relevant and not helpful to the jury. Id. To be relevant, the evidence must “fit” the case by being “sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.” Id. (quoting U.S. v. Downing, 753 F.2d 1224,1242 (3d Cir.1985)).
¶ 25. Testimony is reliable when it is “based upon sufficient facts or data,” is “the product of reliable principles and methods,” and when “the witness has applied the principles and methods reliably to the facts of the ease.” M.R.E. 702. Under the reliability prong, the focus is on the “principles and methodology” underlying an expert opinion, not on the conclusions generated. Miss. Transp. Comm’n v. McLemore, 863 So.2d at 37 (quoting Daubert, 509 U.S. at 595, 113 S.Ct. 2786). Expert testimony will always be deemed unreliable if it is the product of subjective belief or unsupported speculation. McLe-more, 863 So.2d at 36. The United States Supreme Court in Daubert adopted a non-exhaustive list of factors for use in determining reliability, including (1) “whether the theory or technique can be and has been tested;” (2) “whether it has been subjected to peer review and publication;” (3) “whether, in respect to a particular technique, there is a high known or potential rate of error;” (4) “whether there are standards controlling the technique’s oper *295 ation;” and (5) “whether the theory or technique enjoys general acceptance within a relevant scientific community.” McLe-more, 863 So.2d at 37 (citing Daubert, 509 U.S. at 592-94,113 S.Ct. 2786).
¶26. Rule 702 vests the trial court with a gatekeeping responsibility. McLemore, 863 So.2d at 36 (citing Dau-bert, 509 U.S. at 589, 113 S.Ct. 2786). In exercising this responsibility, the trial court must preliminarily determine whether the testimony is relevant and “whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning and methodology properly can be applied to the facts in issue.” McLemore, 863 So.2d at 36 (citing Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786). The trial court also should determine what factors are most helpful in determining the reliability of the particular testimony. McLemore, 863 So.2d at 40. The trial court also should determine whether the expert has applied the principles and methodology reliably to the facts of the case. M.R.E. 702(3).
¶ 27. Finally, the trial court should admit expert testimony only if it is more probative than prejudicial under Rule 403. Denham, 60 So.3d at 784. “Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.” Daubert, 509 U.S. at 595, 113 S.Ct. 2786.
¶ 28. This Court reviews the trial court’s admissibility determination for abuse of discretion. Anderson v. State, 62 So.3d 927, 936 (Miss.2011). “A trial judge’s determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion.” Denham, 60 So.3d at 783 (quoting Worthy v. McNair, 37 So.3d 609, 614 (Miss.2010)).
¶ 29. The trial court excluded the testimony of Dr. Neuschatz upon a finding that the testimony would not assist the trier of fact and would be confusing. The trial court did not rule on whether expert eyewitness identification testimony is admissible in the courts of Mississippi; instead, the court found that it would not be helpful to the jury in this particular case. The trial court deemed the testimony lacking because Dr. Neuschatz had not observed Josh’s in-court testimony, but only had reviewed a transcript of his testimony. The trial court also found that the probative value of the testimony was exceeded by the testimony’s potential to confuse the jury.
¶ 30. At the Daubert hearing, Dr. Neuschatz testified that he was an expert in the area of memory and eyewitness identification. He had performed numerous studies in the field of eyewitness identification. Dr. Neuschatz testified about several phenomena that affect a crime victim’s ability to identify the perpetrator from a line-up. He testified that high stress impairs memory. He testified about the phenomenon of weapons focus— the idea that, when a weapon is present, it draws the victim’s attention to the weapon and away from the person holding the weapon. He testified that a victim may select from the lineup a bystander to the crime or someone he or she has seen before just because that person seems familiar, even if that individual is not the perpetrator. Further, he testified about the problem of cross-racial identification — that people have difficulty identifying individuals of another race. However, he testified that, if a person has been exposed to individuals of another race on a regular basis, *296 the person’s identification of a member of that race would be more reliable. Dr. Neuschatz also testified that, according to standards promulgated by the Department of Justice and the American Psychinosis Law Society, there are four requirements for a non-suggestive lineup: (1) the lineup administrator must not know the suspect’s identity, (2), the victim should be informed the suspect may not be in the lineup, (3) the administrator should take the victim’s confidence statement after the identification, and (4) the suspect should not stand out in the lineup.
¶ 81. Dr. Neuschatz related these tenets to the facts of the case as he understood them and concluded that Josh’s identification of Corrothers from the photographic lineup “could” be unreliable. Dr. Neuschatz testified that he was able to glean from Josh’s testimony those factors that would have affected his identification of the perpetrator. He testified that, because the crime was stressful for Josh, the perpetrator was of a different race, a weapon was present, Josh had seen Cor-rothers before, Josh had a short exposure time, it was dark, and Josh had memory issues from a traumatic brain injury, Josh’s ability to accurately identify the perpetrator from the photo lineup would have been adversely affected. He also testified that the- lineup was suggestive because it violated three of the four requirements of a nonsuggestive lineup, making it more likely Josh would have selected Cor-rothers. He further testified that in-court identifications such as the one made by Josh are probably suggestive, but did not offer any scientific basis for that opinion.
¶ 82. Dr. Neuschatz’s proffer demonstrates that he had an incorrect and incomplete understanding of the facts on which he based his opinions and a total lack of expertise about Josh’s memory problems. Because Dr. Neuschatz did not apply his principles and methodology reliably to the facts of the case as required by Rule 702, we find that his testimony was unreliable and inadmissible. Dr. Neuschatz testified that Josh could have confused Corrothers with the perpetrator based on Josh’s testimony that he had seen him before. But Josh actually testified that he had never seen Corrothers before the crime. Dr. Neuschatz testified that an individual who has been exposed to members of another race would have less risk of cross-racial identification problems. But Josh never testified about the extent of his interactions with African Americans; Dr. Neus-chatz simply assumed that Josh would have problems identifying persons of a different race. Dr. Neuschatz testified that Josh was exposed to the perpetrator for a short time; however, Josh testified that he observed the perpetrator both inside and outside the house, and no evidence established the duration of the crime. While Dr. Neuschatz testified that it was dark in the house, Josh testified that all the lights were on. Dr. Neuschatz testified that memory is impaired in high-stress situations, but Josh never testified to the amount of fear or anxiety he experienced during the crime. While Dr. Neus-chatz testified that Josh’s memory would have been impaired by the presence of a weapon, Josh testified that the weapon was trained on him only once, and that he had several opportunities to observe the perpetrator when he was not holding a gun on him.
¶ 33. Further, Dr. Neuschatz testified outside his area of expertise when he concluded that Josh’s memory problems, along with the other factors, would have impaired his identification. It was undisputed that Josh had suffered a traumatic brain injury in a car accident. Although Josh disagreed that he had memory problems as a result of the injury, other witnesses testified that Josh had memory *297 problems from the injury.[3] When asked if he had any expertise with brain injuries and how they could affect eyewitness identifications, Dr. Neuschatz admitted that he had no expertise whatsoever in that area. He said he had done no research on how brain injuries relate to eyewitness identification. Yet Dr. Neuschatz testified that he took Josh’s memory problems into account in reaching his ultimate conclusion that his identification of Corrothers from the photo lineup “could” be unreliable.
¶ 34. This testimony demonstrated that Dr. Neuschatz could not reliably apply the science to the facts of the case and that his testimony properly was excluded. M.R.E. 702. An expert opinion that is “fundamentally based on insufficient information” is unreliable and must be excluded from evidence. Paz v. Brush Engineered Materials, Inc., 555 F.3d 383, 388-89 (5th Cir.2009) (where doctor rendered a diagnosis based on her evaluation of a second doctor’s report and assumed the second doctor had performed certain tests, the diagnosis was unreliable because the record showed the second doctor had not, in fact, performed the tests). “[I]f the expert’s opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded. An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported.” Neb. Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 416 (8th Cir.2005) (an expert’s estimate of future damages was unreliable for failure to take “a plethora” of relevant facts into consideration); see also Myers v. III. Cent. R. Co., 629 F.3d 639, 645 (7th Cir.2010) (because causation experts lacked an adequate understanding of the plaintiffs medical history and work, their opinions that the work had caused the plaintiffs injuries were unreliable). We recognize that “[vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.” Daubert, 509 U.S. at 596, 113 S.Ct. at 2798. But when an expert’s opinions fundamentally rest upon insufficient information, they are unreliable and properly excluded from the jury’s consideration. Paz, 555 F.3d at 388-89.
¶ 35. Dr. Neuschatz attempted to apply the principles and methodologies underlying his expertise in eyewitness identification to opine that Josh’s identification “could” be unreliable. But Dr. Neus-chatz’s opinions were undermined by his inaccurate and incomplete understanding of the facts on which he based his opinions and his complete lack of expertise on Josh’s brain injury. These deficiencies rendered his opinions so fundamentally unsupported that they could offer no assistance to the jury and amounted to nothing more than unsupported speculation. His testimony was unreliable, and there was no abuse of discretion in excluding it. We further note that Dr. Neuschatz’s testimony was inconclusive and speculative because he did not offer his opinions to a reasonable degree of scientific certainty, but testified only that Josh’s lineup identification “could” be unreliable and that in-court identifications “probably” are suggestive. Nor did Dr. Neuschatz submit any peer-reviewed publications supporting his principles and methodologies; the trial court had only the benefit of Dr. Neus-chatz’s curriculum vitae and his testimony that his studies had been subjected to peer review and publication and were generally accepted in the relevant scientific community. These facts further support the exclusion of Dr. Neuschatz’s testimony.
*298 ¶ 86. We find that Dr. Neuschatz did not apply his principles and methodologies reliably to the facts of the case as required by Rule 702, and his testimony was unreliable and properly excluded. We briefly address the dissent’s argument that the trial court improperly weighed the witness testimony in determining that Dr. Neus-chatz’s testimony would not be helpful to the jury. The trial court discussed the eyewitness testimony and expert testimony on eyewitness identification generally and then stated:
The risk of confusion I believe is very high in this case as opposed to the opportunity for anything that might aid the trier of fact. In this case the proof is clear that these two eyewitnesses had a fairly lengthy period of time to observe the defendant. Maybe even longer and the record already reflects that and the expert was not in the courtroom. Did not have an opportunity to observe the testimony of either of the eye witnesses ... I think the jury in this case is well equipped to handle the case, ... and specifically under the facts of this case the court finds that this particular expert testimony will not assist the trier of fact to understand the evidence or determine any facts in issue.
From our review of the totality of the trial court’s ruling, it is apparent that the court excluded the testimony under the relevance prong of Rule 702 and under Rule 408 as more prejudicial than probative due to the risk of confusion of the issues. Because we find that Dr. Neuschatz’s proffered testimony was unreliable and inadmissible under Rule 702, we find no abuse of discretion in its exclusion.
II. WHETHER THE TRIAL COURT ERRED WHEN IT ADMITTED IN-COURT IDENTIFICATIONS OF CORROTHERS.
¶37. Corrothers argues that the trial court erred by not suppressing the in-court identifications of Corrothers by Josh and Tonya. Corrothers claims that the pretrial photo lineups were suggestive and tainted the in-court identifications.

A. Josh’s identification

¶ 38. The trial court denied defense counsel’s motions to exclude all photo lineups, identifications, and related testimony by Josh. Corrothers argues that the trial court should have suppressed Josh’s in-court identification because it was tainted by an improper pretrial lineup identification. This Court applies a two-part test to determine the admissibility of a pretrial identification: “A court must first determine whether the identification process was unduly suggestive. And even if it was, the court has the right to admit the identification if it determines that the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed.” Latiker v. State, 918 So.2d 68, 74 (Miss.2005) (citing Neil v. Biggers, 409 U.S. 188,198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). Moreover, “[i]n practice, Mississippi tends to place a heavy burden on defendants who are contesting the propriety of a pretrial identification procedure.” Jones v. State, 993 So.2d 386, 393 (Miss.Ct.App.2008).
1. Whether the lineup was suggestive.
¶ 39. A photographic lineup is impermissibly suggestive when the accused is “conspicuously singled out in some manner from the others.” York v. State, 413 So.2d 1372,1383 (Miss.1982). “In general, courts will find a lineup to be imper-missibly suggestive if the defendant is the only one depicted with distinctive features .... But ‘minor differences with the suspects or differences in the photograph backgrounds will not render a lineup im-permissibly suggestive.’ ” Batiste v. State, 121 So.3d 808, 856 (Miss.2013) (quoting *299 Butler v. State, 102 So.3d 260, 265 (Miss.2012)). In Jones v. State, the Court found that a lineup in which the accused was the only individual wearing a coat, which happened to be included in the store clerk’s description of the armed robber, was not tantamount to being impermissibly suggestive. Jones, 998 So.2d at 393. In a different case by the same name, the suspect was the only individual in the lineup wearing a baseball cap, and the Court again found that the lineup was not impermissi-bly suggestive. Jones v. State, 504 So.2d 1196,1199-1200 (Miss.1987).
¶40. In the photographic lineup at issue, four of the six individuals were wearing orange Mississippi Department of Corrections (MDOC) jumpsuits, the fifth individual’s photo was cropped to show only his head, and Corrothers was wearing a white t-shirt. Both Josh and Tonya previously had described the shooter as wearing a white t-shirt. Corroth-ers’s picture was somewhat brighter than the other five pictures. While it could be argued that Corrothers’s picture stands out slightly from the rest, according to our precedent, and although Corrothers was the only person wearing a white t-shirt matching the previous description, and his picture was brighter than the others, and four of the six photos depicted individuals in MDOC custody, the lineup does not conspicuously single out Cor-rothers. See Jones, 993 So.2d at 393 (photographic lineup was permissible where “the backgrounds of the photographs clearly indicate that all individuals were in the custody of law enforcement, and the only difference is the photographic technique used to capture the defendant’s likeness”). See also Jones, 504 So.2d at 1199-1200; Anderson v. State, 724 So.2d 475, 478 (Miss.CtApp.1998). We find that the photographic lineup shown to Josh was not impermissibly suggestive.
2. Whether Josh’s identification was reliable.
¶41. In Biggers, the Supreme Court set out five factors to consider in determining the reliability of an identification: “(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.” Latiker, 918 So.2d at 74 (citing Biggers, 409 U.S. at 199-200, 93 S.Ct. 375).
¶ 42. Josh testified that he had never seen the shooter before the night of the murders. It was dark when the shooter arrived at his house, and the incident took place relatively quickly. However, Josh had ample opportunity to see the shooter. He saw the shooter when he arrived at the house and jumped out of Taylor’s car. Josh remained outside when the shooter first entered the trailer, but he went inside at some point during the attack. The shooter turned on Josh, followed him into his bedroom, yelled at him, and put a gun to his head. Due to the close proximity of Josh and the shooter, Josh had a decent opportunity to view the shooter, and we find that the first Biggers factor does not weigh in Corrothers’s favor.
¶43. The second factor, Josh’s degree of attention, also weighs against Corroth-ers. No facts suggest that Josh was not fully focused on the car when Taylor arrived with the shooter or that he was not attentive during the subsequent interactions. This situation does not involve a bystander to a crime or someone who saw a crime occur from a distance — Josh was a *300 victim of this crime, which took place in his own home, with the shooter very close to him at times. Further, Josh’s high degree of attention is supported by the detailed description he gave of Corrothers.
¶ 44. Josh described the shooter to police as a black male, approximately six feet tall, dark skinned, skinny, with short hair and a goatee, and wearing a white t-shirt and blue-jean shorts. This description matched Corrothers as well as the man seen in the Kangaroo Express video. Thus, the third Biggers factor—the accuracy of Josh’s prior description of the criminal—weighs against Corrothers.
¶ 45. Likewise, the fourth Biggers factor weighs against Corrothers, as Josh demonstrated a high level of certainty when he identified Corrothers. Josh quickly identified Corrothers when he was shown the photo lineup, suggesting high confidence in his selection. Finally, the fifth factor—the length of time between the crime and the confrontation—goes against Corrothers because only five days had passed from the time of the crime to the presentation of the lineup. The application of the Biggers factors indicates that Josh’s identification of Corrothers in the photo lineup was reliable.
¶ 46. Because the photo lineup was not impermissibly suggestive and Josh’s identification was reliable, we find that it did not taint Josh’s in-court identification of Corrothers. The trial judge did not err in admitting Josh’s pretrial and in-court identifications of Corrothers and related testimony.

B. Tonya’s identification

¶ 47. We now address a subissue raised by Corrothers in his pro se supplemental brief: whether the trial court erred by allowing Tonya to make an in-court identification that was not consistent with her pretrial identification. Tonya was unable to identify Corrothers from the photographic lineup presented by police pretrial. Tonya was not included in Corrothers’s motion to exclude the photo lineup, which focused exclusively on Josh’s identification. At trial, Tonya identified Corrothers. The defense failed to object to Tonya’s in-court identification. Because Corrothers did not object, he waived this issue on appeal. McQuarter v. State, 574 So.2d 685, 688 (Miss.1990); see also Galloway v. State, 122 So.3d 614, 662-64 (Miss.2013).
¶ 48. Notwithstanding the procedural bar, this issue is without merit. Applying the Biggers factors, although Tonya was unable to identify Corrothers from the pretrial photographic lineup, she had a good opportunity to view Corrothers attentively at the time of the crime, and her in-court identification, though attenuated from the date of the crime, was not so unreliable as to be inadmissible. We observe that, because both Josh and Karen Hiekinbottom also identified Corrothers, Tonya’s identification was cumulative. Nothing indicates that Tonya’s identification of Corrothers in court amounted to a manifest miscarriage of justice or denied Corrothers a fair trial.
III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS INSTRUCTIONS TO THE JURY AT THE CULPABILITY PHASE.
¶ 49. Corrothers’s third argument alleges that the trial court erred in refusing his proposed jury instructions D-3, D-6, D-7, D-10, and D-ll, which he asserts were correct statements of the law and warranted by the evidence. Additionally, Corrothers argues the trial court erred by failing to grant a cautionary instruction on the unreliability of eyewitness identification. Our standard of review for *301 challenges to jury instructions is well-settled:
Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
Austin v. State, 784 So.2d 186, 192 (Miss.2001) (quoting Humphrey v. State, 759 So.2d 368, 380 (Miss.2000) (overruled on other grounds)). Further, “[i]n homicide cases, the trial court should instruct the jury about a defendant’s theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely.” Evans v. State, 797 So.2d 811, 815 (Miss.2000) (quoting Manuel v. State, 667 So.2d 590, 593 (Miss.1995)).

A. Proposed instruction D-3

¶ 50. The relevant portion of proposed instruction D-3 read,
[U]nder the law you do not have the right to convict Caleb Corrothers upon mere suspicion, regardless of how strong that suspicion might be. You may not convict Caleb Corrothers just because there may be a preponderance of the evidence against him or just because there may be a reason to suspect that he is guilty. Suspicion, no matter how strong or convincing, never rises to the dignity of proof beyond a reasonable doubt. Before you find Caleb Corroth-ers guilty, you must be convinced solely upon the evidence presented during this trial that Caleb Corrothers is guilty beyond a reasonable doubt.
The State argued the instruction was an “attempt to define reasonable doubt.” The trial judge stated, “I believe I could give this instruction but I never have and I don’t intend to today unless /all give me some authority that it’s error for me not to give it.” Corrothers concedes that the sentence reading, “[suspicion, no matter how strong or convincing, never rises to the dignity of proof beyond a reasonable doubt,” would be objectionable; however, he argues that the trial court should have found that the instruction was partially acceptable, ordered the improper language to be deleted, and given the remaining part of the instruction.
¶51. The Court previously has disapproved of instructions on reasonable doubt. See Holland v. State, 705 So.2d 307, 355 (Miss.1997); Giles v. State, 501 So.2d 406, 409 (Miss.1987); Hunter v. State, 489 So.2d 1086, 1089 (Miss.1986). “[A] trial judge is not required to grant an instruction which is cumulative of another.” Edwards v. State, 594 So.2d 587, 593 (Miss.1992). Here, instruction C-2 instructed the jury that Corrothers was presumed to be innocent and that the State bore the burden of proving him guilty, beyond a reasonable doubt, “of every material element of the crime with which he is charged.” Additional instructions S-2, S-5, S-8, and D-13-A also included the requirement of finding Corrothers guilty beyond a reasonable doubt. Because the jury adequately was instructed on reasonable doubt, proposed instruction D-3 was redundant and properly denied.

B. Proposed instruction D-6

¶ 52. Corrothers’s proposed instruction D-6, addressing the credibility of witness testimony, read:
In determining the weight to be given to the testimony of any of the witnesses who testify, you should consider the witnesses’ credibility as judged by you, the members of the jury. Members of the *302 jury should also weigh the bias, interest and motive of all the witnesses who testify, not just the bias, interest and motive of the person charged with the crime. If you do not believe a particular witness or find that a witness is not credible you do not have to accept that testimony.
The trial court rejected the instruction, saying, “it’s very similar to what the court has already given. I’m going to refuse it. It’s just saying it another way.” The trial court instead provided C-l, which stated, “[y]our exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified.” As stated previously, “[t]he refusal to grant a jury instruction that is similar to one already given does not constitute reversible error.” Walker v. State, 918 So.2d 198, 234 (Miss.2005). Proposed instruction D-6 would have been redundant in light of C-l; thus, the trial court did not err in refusing D-6.

C. Proposed instruction D-7

¶ 53. Corrothers asserts that the court erred in rejecting his proposed instruction D-7 in favor of C-5. Proposed instruction D-7 pertained to informant testimony, and it provided:
The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged informant, and requires the jury to weigh same with great care and suspicion. You should weigh the testimony from an alleged informant, and passing on what weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.
The trial judge rejected D-7 and gave C-5 instead, reasoning that the “language [of D-7] was obsolete and actually I don’t believe that it’s been overruled but there are several different ways to give a cautionary instruction and I have found one in another case and am offering it in court’s instruction 5.” C-5 read:
The Court instructs the jury that the testimony of an informant who provides evidence against a defendant for benefit, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. You the jury must determine whether the informant’s testimony has been affected by interest or prejudice against the defendant.
¶ 54. Corrothers cites Moore v. State, 787 So.2d 1282, 1286-88 (Miss.2001), in which the Court found the trial court had abused its discretion in rejecting the exact instruction proffered by Corrothers and instead provided an instruction that did not advise the jury to weigh the testimony with “caution and suspicion.” The Court found the instruction was warranted due to evidence that the jailhouse informant in that case may have received favorable treatment in exchange for his testimony. Corrothers also cites Wheeler v. State, 560 So.2d 171, 173-74 (Miss.1990), for the proposition that a cautionary instruction on this type of testimony must contain the words “with suspicion;” however, Wheeler involved uncorroborated testimony by an accomplice/coconspirator to the crime, not testimony by an informant.
¶55. Here, it is undisputed that the jailhouse informant, Frederick Holmes, testified in exchange for “consideration on [his] auto burglary charges.” But at trial, Holmes did not know exactly what type of consideration he would be afforded. More recently than the holding in Moore, the Court has found that “the failure to give a cautionary instruction regarding [the infor *303 mant’s] testimony was not an abuse of discretion” because the details of the informant’s paid arrangement were disclosed to the jury and the informant was subject to cross-examination. Webber v. State, 108 So.3d 930, 931-32 (Miss.2013) (citing White v. State, 722 So.2d 1242, 1247-48 (Miss.1998)). While jury instruction D-7 was a properly worded jury instruction regarding informants, under Webber, it was not necessary to give an cautionary informant instruction, because Holmes’s arrangement was disclosed to the jury and he was subject to cross-examination. Regardless, C-5 was a proper instruction.

D. Proposed instruction D-10

¶ 56. Corrothers asserts that the trial court erred in rejecting proposed instruction D-10, which read: “The Court instructs you that if you have a reasonable doubt as to the identity of the alleged shooter in this case you must find the Defendant, Caleb Corrothers, not guilty on all counts.” Instructions given to the jury included the elements instruction on the capital murder of Taylor, which instructed the jury to find Corrothers not guilty if the State failed to prove any one of the elements that Corrothers “did wilfully, unlawfully, feloniously, shoot with a firearm and kill Taylor Clark.” The elements instruction on the capital murder of Frank contained identical language pertaining to Frank. Similarly, S-8 instructed the jury to find Corrothers not guilty “if the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt,” including a finding that Corrothers shot Tonya with a gun.
¶ 57. “The. refusal to grant a jury instruction that is similar to one already given does not constitute reversible error.” Walker, 913 So.2d at 234 (Miss.2005). Further, a “trial judge is under no obligation to grant redundant instructions.”
Montana v. State, 822 So.2d 954, 961 (Miss.2002) (citing Ellis v. State, 790 So.2d 813, 815 (Miss.2001) (overruled on other grounds)). Because proposed instruction D-10 was covered in other instructions that were given, the trial judge did not err in refusing to grant Corrothers’s instruction D-10.

E. Proposed instruction D-ll

¶ 58. Corrothers argues that the trial court erred in refusing proposed instruction D-ll, which read:
The Court instructs the Jury that if there be a fact or circumstance in this case susceptible of two interpretations, one favorable and the other unfavorable to the accused, when the Jury has considered such fact or circumstance with all other evidence, there is a reasonable doubt as to the correct interpretation, then you, the Jury, must resolve such doubt in favor of the accused, and place upon such fact or circumstance the interpretation most favorable to the accused.
At the jury-instruction conference, the instruction was refused with no comment other than from the State, which said, “this is a circumstantial instruction two theory case. It’s only applicable in circumstantial cases and there are two eye witnesses in this case.” Corrothers argues that, if the trial court properly had excluded the eyewitness identification testimony, then D-ll would have been allowed. Two-theory instructions are reserved for circumstantial-evidence cases, which are cases in which there is no direct evidence such as an eyewitness or a confession to the crime. State v. Rogers, 847 So.2d 858, 863 (Miss.2003) (citing Mangum v. State, 762 So.2d 337, 344 (Miss.2000)). Corroth-ers is correct that if there had been no eyewitness testimony, D-ll may have been appropriate; however, as discussed *304 above, the trial court did not err in allowing the eyewitness testimony. Therefore, the court did not err in refusing the instruction.

F. Unreliability of eyewitness identifications

¶ 59. Finally, Corrothers argues that, although not requested by defense counsel, the trial court erred by failing to instruct the jury sua sponte as to the unreliability of eyewitness identifications. As previously stated, if an issue or objection was not raised at trial, it is pro-eedurally barred. McQuarter, 574 So.2d at 688. Because Corrothers did not request a cautionary instruction on the unreliability of eyewitness testimony, the issue is procedurally barred.
¶ 60. Notwithstanding the procedural bar, this issue is without merit. This Court refused a cautionary instruction on the unreliability of eyewitness identification in Hansen v. State, stating:
The proposed instruction, GP-13, was a cautionary instruction concerning eyewitness identification testimony. In Holmes v. State, 483 So.2d 684, 687 (Miss.1986), this Court held such instructions were properly refused. The Court said:
[W]e know of no rule of law or standard of evidence which requires that identification testimony be viewed with caution and that juries be instructed to that effect. Our cases on the point expressly hold that such an instruction should not be given. Hines v. State, 339 So.2d 56, 58 (Miss.1976); Clubb v. State, 350 So.2d 693, 697 (Miss.1977); Ragan v. State, 318 So.2d 879, 882 (Miss.1975) (emphasis in original).
Again, the jury was instructed generally on its duty to scrutinize carefully all testimony of all witnesses, and, as well, on the prosecution’s burden to prove Hansen guilty beyond a reasonable doubt. We find no error here.
Hansen v. State, 592 So.2d 114, 141 (Miss.1991). Notwithstanding the procedural bar, the trial court was not required to instruct the jury sua sponte on the unreliability of eyewitness identification.
IV. WHETHER CORROTHERS’S CONVICTION MUST BE REVERSED DUE TO UNCONSTITUTIONAL RACIAL DISCRIMINATION BY THE PROSECUTION IN THE JURY SELECTION PROCESS AND OTHER JURY-SELECTION ERRORS BY THE TRIAL COURT.
¶ 61. Corrothers’s jury consisted of nine whites and three African Americans, with one African-American alternate. Corrothers argues that his conviction must be reversed because the State racially discriminated in its use of peremptory strikes during jury selection. Peremptory strikes alleged to be racially discriminatory are analyzed under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Batson requires a three-step process to determine whether racial discrimination against jurors has occurred and, if so, whether it compromised the defendant’s constitutional rights. Batson, 476 U.S. at 96-100,106 S.Ct. 1712. This Court has summarized Batson’s requirements as follows:
First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine *305 whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.
Pitchford v. State, 45 So.3d 216, 224 (Miss.2010) (citing Flowers v. State, 947 So.2d 910, 917 (Miss.2007)).
¶ 62. The defendant makes a prima facie case of discrimination by showing:
(1) that he is a member of cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant’s race; (3) and the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.
Flowers, 947 So.2d at 917. Once a prima facie case has been made, the prosecution meets its burden by offering a race-neutral reason for the strike. Id. Reasons given for a strike “need not be persuasive, or even plausible; so long as the reasons are not inherently discriminatory, they will be deemed race-neutral.” Batiste v. State, 121 So.3d 808, 848 (Miss.2013). Once the race-neutral explanation hás been given, the trial court must determine whether the reason was a pretext for discrimination. Flowers, 947 So.2d at 917. We have acknowledged five indicia of pretext that are relevant when determining whether a proffered race-neutral reason was, in fact, pre-textual:
(1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge;
(2) the failure to voir dire as to the characteristic cited; ... (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.
Id. (quoting Manning v. State, 765 So.2d 516, 519 (Miss.2000)).
¶63. “In deciding whether the defendant has made a sufficient showing of discrimination, the trial court must consider all relevant circumstances.” Batiste, 121 So.3d at 848. On review of the trial court’s ruling on a claimed Batson violation, “[w]e give great deference to the trial court’s findings of whether or not a peremptory challenge was race neutral. ... Indeed, we will not overrule a trial court on a Batson ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence.” Thorson v. State, 721 So.2d 590, 593 (Miss.1998).

A. Procedural bar

¶ 64. At voir dire, Corrothers raised Batson challenges to five jurors: Carole Ray, Betty Collins, Phyllis Berry, W.C. Brim, and Deidre Hereford. In his motion for a new trial, Corrothers argued that the trial court improperly overruled his Bat-son objections to six of the State’s peremptory strikes; however, he did not identify those six strikes in the motion. On appeal, Corrothers makes arguments on the five jurors listed above and also raises Batson arguments as to three additional jurors unchallenged at trial: Pamela Billups, Shereca Watkins, and Antonio Edwards.
'¶ 65. Corrothers is procedurally barred from making a Batson challenge to a juror for the first time on appeal. “[A] party who fails to object to the jury’s composition before it is empaneled waives any right to complain thereafter.” Thorson v. State, 895 So.2d 85, 118 (Miss.2004). And when a defendant fails to “raise the Batson claim during the course of the trial,” the defendant “is pro *306 cedurally barred from raising this claim on direct appeal.” Branch v. State, 882 So.2d 36, 59 (Miss.2004).
¶ 66. Further, although Corroth-ers challenged five jurors at trial, he offered rebuttal of the State’s reasons for the strikes as to only one of those jurors, W.C. Brim. This Court has held that, when a defendant fails to rebut the State’s offered reasons for a strike, “[w]e will not now fault the trial judge with failing to discern whether the State’s race-neutral reasons were overcome by rebuttal evidence and argument never presented.” Pitchford v. State, 45 So.3d 216, 227 (Miss.2010). Corrothers failed to rebut the State’s proffered race-neutral reasons for its exercise of strikes on Ray, Collins, Berry, and Hereford. Therefore, Corrothers did not preserve his pretext arguments for appeal as to Ray, Collins, Berry, and Hereford.

B. Batson challenges

¶ 67. At trial, the State struck seven white jurors and five African-American jurors, and the final jury was comprised of nine whites and three African Americans. Corrothers made his Batson challenge after the jury was selected. The entirety of Corrothers’s argument supporting his pri-ma facie case is as follows:
By Mr. Rushing: Judge Howorth, before we go for the record on I guess my Batson challenges to SI, S2, S6, S7[,] S8 by the race neutral reasons for it.
By the Court: ... All right.’ If you are going to make your Batson challenge I want you to make a record on it. I have no idea who these people are. I invite you to go ahead and make your prima facie case.
By Mr. Rushing: Your Honor, the strikes that I just called were strikes used by the State to eliminate the black jurors or those black jurors off of the jury and there is nothing in their testimony while we were out there during the voir dire that would have given rise for them to be stricken other than eliminating a substantial portion of the black jurors out of the first set of this panel that we have. And there, unless there is some showing that they are eliminated because they are black jurors and we have a black defendant accused of a crime against a white family.
The trial court stated “in the abstract” that Corrothers’s Batson challenge was late, and that he should have made it as soon as he detected the discriminatory pattern, to have afforded the trial court an opportunity to correct it. Then, the trial court found that Corrothers had not made a prima facie case, but directed the State to provide its reasons for the allegedly discriminatory strikes on the record. The State gave race-neutral reasons for its strikes of Ray, Collins, Berry, Brim, and Hereford. The trial court stated for the record that the demographics or races of the jurors were not before the court. Without further analysis, the trial court denied Corrothers’s Batson challenges.
¶ 68. We observe that the trial court’s failure to articulate specific findings in its ruling on the State’s race-neutral reasons is not reversible error. In Pruitt v. State, 986 So.2d 940, 946 (Miss.2008), the Court stated:
[I]n addressing a Batson claim, the Supreme Court has stated, “[w]e adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it.” Miller-El v. Cockrell, 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). A number of courts have used this statement to reject the argument that a trial court must make specific findings of fact regarding the proffered race-neutral reasons. See [,] e.g., State v. Frazier, *307 115 Ohio St.3d 139,152, 873 N.E.2d 1263 (2007) (while more thorough findings would have been helpful, “the trial court is not compelled to make detailed factual findings to comply with Batson ”); Laman v. Boatwright, 467 F.3d 1097, 1101 (7th Cir.2006) (where a trial court failed to make findings on each proffered reason, it is sufficient if the appellate court can infer from the record that the trial judge engaged in the step-three inquiry); Messiah v. Duncan, 435 F.3d 186, 198 (2d Cir.2006) (“As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his Batson ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a Batson challenge.”)
We stated that, while the trial court should make on-the-record findings on each race-neutral reason provided by the State, as long as the record provides a basis in fact for the trial court’s ruling, reversal is not required. Id. Further,
[wjhere a trial judge fails to elucidate such a specific explanation for each race-neutral reason given, we will not remand the case for that Raison-related purpose alone. This Court is fully capable of balancing the Batson factors in cases such as this one. Continued remand of such cases only wastes the trial court’s limited resources and acts to further delay justice.
Id. at 946-47 (quoting Burnett v. Fulton, 854 So.2d 1010, 1016 (Miss.2003)). As in Pruitt, here we find the trial court’s ruling was sufficient for appellate review.

1. Prima facie case/pretext

¶ 69. Corrothers argues that he made a prima facie case of racial discrimination and showed pretext by showing that the State had exercised peremptory challenges on an unacceptably high number of African Americans compared with whites. While, at trial, Corrothers did not provide detail as to the racial discrimination alleged, he provides more information on appeal. He argues that the venire pool of forty-four individuals contained twelve African-American members (27%) and thirty-two white members (73%). However, the State eliminated eight of the twelve (66%) African-American venire members tendered to it, and eliminated only seven of the thirty-two (22%) white venire members tendered. In other words, the State struck African-American members at a rate more than twice as often as the rate at which African Americans appeared in the venire pool.
¶ 70. This Court faced a similar situation in Pitchford v. State and determined that the trial court was justified in finding the defendant had made a prima facie case of discrimination. We stated that:
[T]he State used fifty-seven percent of its peremptory strikes (four out of seven) to remove African-Americans from a venire comprised of twenty-six percent African-American and seventy-four percent white. While the difference in these percentages is not so great as to constitute, as a matter of law, a prima facie finding of discrimination, it is sufficient for a trial judge — who was “on the ground” and able to observe the voir dire process, and in the exercise of sound discretion — to so find.
Pitchford, 45 So.3d at 225-26. The Court has stated, “though the sheer number of strikes exercised against a cognizable group of jurors is not itself dispositive of our analysis, ‘the relative strength of the prima facie case of purposeful discrimination will often influence this inquiry’ into Batson challenges.” Flowers, 947 So.2d at 935 (quoting Sewell v. State, 721 So.2d 129, 136 (Miss.1998)).
*308 ¶ 71. Distinguishing this case from Pitchford, is the fact that Corrothers did not articulate before the trial court the percentages of the venire pool or the percentage of strikes used against African Americans. Instead, he simply stated that African-American jurors had been struck and that, in this case, the victims were white and the defendant was African-American. In Strickland v. State, we stated that:
[The] Court finds that exercising seven peremptory strikes against African-Americans, standing alone, absent any other facts or circumstances related to (1) racial composition of the venire, empaneled jury, or community, or other non-exclusive factors such as (2) the prosecutor’s conduct, (3) the habitual policies of these prosecutors, (4) the stated policies of the district attorney’s office, or (5) the nature of the case itself, ... fails to establish “a prima facie showing that race was the criteria for the exercise of the peremptory challenge.” Carter [v. State], 799 So.2d [40] at 46 [ (Miss.2001) ]. As no evidence was offered in the trial court to support Strickland’s claim of a Batson violation, this Court cannot conclude that the circuit court clearly erred in denying Strickland’s request for a Batson hearing.
Strickland v. State, 980 So.2d 908, 917 (Miss.2008). As in Strickland, Corrothers failed to provide the trial court with information on the racial composition of the venire, the empaneled jury, or the community. Although he complains of the habitual policies of the district’s prosecutors on appeal, he did not provide the trial court with that information to assist its ruling. The finding of no prima facie case and no pretext for discrimination was within the trial court’s discretion. Nonetheless, assuming, arguendo, that a prima facie case was established, we proceed to review the State’s race-neutral reasons for its peremptory strikes of individual jurors.

2. Carole Ray

¶ 72. As discussed above, Corrothers’s argument as to Ray is procedurally barred. Notwithstanding the procedural bar, it is without merit. The prosecutor’s reason for striking Ray was that she had not understood some of the questions on the jury questionnaire. Corroth-ers contends that this reason was pretex-tual because of disparate treatment — that the prosecution failed to challenge jurors of the opposite race with the same characteristic. He refers the Court to four white jurors whom he contends demonstrated a lack of understanding commensurate with Ray’s. Our review of the questionnaires of the three of those jurors who returned them reveals no persuasive grounds for comparison with the answers provided by Ray, and the fact that the fourth juror failed to return his questionnaire does not mean that juror did not understand the questionnaire. A juror’s indefinite answers on a juror questionnaire are a sufficient race-neutral reason for a strike. Lockett v. State, 517 So.2d 1346, 1356 (Miss.1987) (citing Rodgers v. State, 725 S.W.2d 477, 480 (Tex.Ct.App.1987)). We find that the trial court’s finding of no Batson violation was not clearly erroneous or against the overwhelming weight of the evidence.

3. Betty Collins

¶ 73. As previously discussed, Corrothers’s argument as to Collins is procedurally barred. Notwithstanding the procedural bar, it is without merit. The prosecution’s race-neutral reason for its strike of Collins was that “[s]he said she disliked people who sell drugs and steal and because the victim in this case did it is going to come in that he did sell [m]arijua- *309 na.” The trial court did not abuse its discretion in finding that the State’s reason was not motivated by discrimination. The proof at trial was that one of the victims, Taylor, had sold marijuana, and Collins’s answer indicated her potential prejudice toward that victim because he sold drugs. This was a sufficient race-neutral reason for the strike. While Cor-rothers points to jurors accepted by the prosecution who had been associated with drugs, none of those jurors stated that he or she did not like people who sold drugs. Therefore, Corrothers’s attempt to show disparate treatment of Collins fails.

Jp. Phyllis Berry and Deidre Hereford

¶ 74. As discussed above, Cor-rothers’s argument as to Berry and Hereford is procedurally barred. Notwithstanding the procedural bar, it is without merit. The prosecutor stated that she struck Berry because she was talking to herself during voir dire and indicated on the juror questionnaire that she was generally against the death penalty. The prosecutor also struck Hereford because she stated in the questionnaire that she was generally against the death penalty. Corrothers argues these reasons were pre-textual because the prosecutor did not voir dire either venire person as to her views on the death penalty and accepted white jurors who had failed to answer the death-penalty-opinion question on the jury questionnaire or marked “no opinion.” A juror’s stance against the death penalty is a valid race-neutral reason for a strike. Pitchford, 45 So.3d at 228-29. And, because expressing no opinion on the death penalty is different from being against it, Corrothers has not shown disparate treatment from the State’s acceptance of jurors who expressed no opinion on the death penalty. We find that the trial court’s finding of no Batson violation was not clearly erroneous or against the overwhelming weight of the evidence.

5. W.C. Brim

¶ 75. The prosecutor struck Brim because he indicated in the juror questionnaire that he was generally against the death penalty and “his nephew was charged with attempted robbery and I believe someone in his family or he has a case pending in Lee County currently.” Because Brim actually stated in his voir dire response that it was his nephew who had a case pending in Lee County, Corrothers argues that the prosecutor’s reason was “entirely false.” But the prosecutor’s statement was not false; she indicated her reason for the strike was in the alternative: that either Brim or his nephew had a case pending in Lee County. Because Brim’s nephew had a case pending in Lee County, the prosecutor’s reason for the strike was supported by the record. Having a family member involved in a criminal proceeding has been deemed a race-neutral reason for a strike. Lockett, 517 So.2d at 1356 (citing Rodgers, 725 S.W.2d at 480). Again, Corrothers tries to show disparate treatment by pointing to venire persons who had relatives with convictions or pending charges who were accepted by the State. Only one of these venire persons, Cody Street, had a relative with a pending charge. However, no disparate treatment is shown, because Street’s father’s charge was pending in Pontotoc County, not in Lee County, from which the jury was drawn. And, as previously established, Brim’s views on the death penalty were a race-neutral reason for the strike. Pitch-ford, 45 So.3d at 228-29. The trial court’s finding of no Batson violation was not clearly erroneous or against the overwhelming weight of the evidence.
*310 V. WHETHER REVERSAL IS REQUIRED FOR THE ERRONEOUS AND UNCONSTITUTIONAL EVIDENTIARY RULINGS AT THE CULPABILITY PHASES OF THE TRIAL.
¶ 76. Next, Corrothers argues reversal is required because of erroneous evidentiary rulings at the culpability phase. Corrothers claims that it was reversible error (a) to allow the jury to listen to the entirety of the 911 call made by Tonya; (b) to not allow Corrothers to impeach Josh by playing the recording of an inconsistent prior statement given to police by Josh; (c) to improperly allow the presentation of the bullets recovered from Taylor and Frank to the jury; (d) to permit Tiffany Hutchins to testify to what she “understood” from overhearing Corroth-ers’s conversation with Frederick Holmes; (e) to allow the jury to hear only half of Corrothers’s audio statement; and (f) to allow Investigator Mills to give fabricated testimony that violated the chain of custody of his investigation and discredited the State’s theory of the case. “A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling.” Jefferson v. State, 818 So.2d 1099, 1104 (Miss.2002) (quoting Fisher v. State, 690 So.2d 268, 274 (Miss.1996)).

A. Tonya’s 911 call

¶ 77. At trial, the State was permitted to play the ten-minute recording of the 911 call made by Tonya immediately after the shootings. Corrothers objected on grounds of authentication, chain of custody, and unfair prejudice under Mississippi Rule of Evidence 403. On appeal, he asserts that it was reversible error for the trial court to permit the jury to hear the 911 call, which Corrothers argues was inflammatory, cumulative of other testimony, and unfairly prejudicial under Rule 403.
¶ 78. Corrothers’s argument as to improper authentication and chain of custody is without merit. “Rule 901(b)(1) of the Mississippi Rules of Evidence provides that authentication can be accomplished by testimony from someone familiar with and with knowledge of the contents of the document or recording.” Bunch v. State, 123 So.3d 484, 492 (Miss.Ct.App.2013) (citation omitted). Tonya, who made the call, testified that the call fairly and accurately represented her conversation with the 911 operator. The trial court denied Corroth-ers’s authentication objection for this reason, and the ruling was not error.
¶ 79. Corrothers also argues that the probative value of the 911 call was substantially outweighed by the danger of unfair prejudice as well as needlessly cumulative under Mississippi Rule of Evidence 403. Rule 403 provides that “[a]l-though relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” M.R.E. 403. Cor-rothers argues that Tonya was “hysterical” in the call, and that her hysteria inflamed the jury. Although at trial, Corrothers objected to the admissibility of the entire call, on appeal, he argues that all but the first two minutes should have been excluded. The trial court did not make on-the-record findings under Rule 403. After the objection was overruled, Corrothers moved for a mistrial, which was denied.
¶ 80. The fact that the trial court did not make on-the-record findings under Rule 403 is not reversible error. Tate v. State, 20 So.3d 623, 639 (Miss.2009). A trial judge’s failure to articulate Rule 403’s *311 “magic words” does not create a presumption that the trial court did not consider the requirements of Rule 403 before admitting evidence. Tate, 20 So.3d at 639 (Miss.2009) (quoting Havard v. State, 928 So.2d 771, 797 (Miss.2006)). We find that the trial court did not abuse its discretion in allowing the entire 911 call to be admitted. While the first two minutes contain much of the substance of the call, the remainder had probative value as well. For example, during the latter portion of the call, Tonya stated that she had been shot, then realized she had been shot in the neck. She also told the dispatcher that the shooter had said her son owed him $5,000. Also, Tonya gave the location of the crime, and she said the shooter had departed in Taylor’s Crown Victoria vehicle headed toward County Road 403.
¶ 81. The recorded 911 call was not unduly prejudicial. While Tonya was emotional during the call, she had just witnessed, and been a victim of, a violent attack that resulted in the death of her husband and youngest son. Tonya cried, but for only a few moments at a time. She raised her voice, but did not appear to scream, yell, or lose control. Tonya was relatively composed under the circumstances and related crucial information to the dispatcher. We find that the trial court did not abuse its discretion in finding that the probative value of the recorded 911 call was not outweighed by the danger of unfair prejudice. Therefore, this issue is without merit.

B. Impeachment of Josh

¶82. Corrothers argues that the trial court erred by preventing his impeachment of Josh with the audio recording of Josh’s interview with Officer Tim Douglas of the Mississippi Bureau of Investigation. Josh testified on direct examination that he had sustained a head injury in an accident, but that his memory was unaffected by the injury. On cross-examination, Cor-rothers asked Josh about the accident and injury, and he testified that he did not remember “about what all happened.” On further cross-examination, Josh admitted that he had given an interview to Douglas, but denied that he told Douglas he had memory problems. Douglas testified that Josh’s wife, but not Josh, had told him during the interview that Josh had memory problems.
¶ 83. On appeal, Corrothers argues that the trial court denied him the opportunity to impeach Josh. This Court has discerned from the record that Corrothers made no attempt to impeach either Josh or Douglas with the audio recording. Because Corrothers made no effort at impeachment with the audio recording during the testimony of either Josh or Douglas, the trial court did not err. Corrothers has failed to establish an inconsistent statement; therefore, this argument is without merit.

C. Bullets recovered from the decedents

¶ 84. Corrothers next argues that, although the parties stipulated to the cause of death for Frank and Taylor, the State introduced “prejudicially gruesome” evidence — bullets taken from the decedents’ bodies during the autopsies. Cor-rothers stipulated to the cause of death to avoid testimony from the medical examiner. The State attempted to introduce the bullets during the testimony of Investigator Mills. Corrothers objected because, in the absence of the medical examiner’s testimony, the chain of custody of the bullets had not been established.
¶ 85. The trial court found that defense counsel’s objection as to chain of custody was a valid objection, but that nothing indicated any reason to believe there had been a break in the chain of custody indicating a lack of reliability of the evidence. The trial court permitted the State and *312 defense counsel to question Investigator Mills out of the presence of the jury as to how he had come into possession of the bullets. Investigator Mills stated that he had received the bullets from the crime lab. He stated that, although he had not personally witnessed the bullets being removed from the decedents by the medical examiner or the transfer of the bullets from the medical examiner to the crime lab, the standard procedure, which appeared to have been followed, was for that to happen. Investigator Mills further stated that Deputy Bundren had picked up the bullets from the crime lab and delivered them to Mills. Stating that he did not “see any evidence, any lack of reliability,” the trial court allowed the State to enter the bullets into evidence and allowed Investigator Mills to testify that he had received them from the crime lab.
¶ 86. This Court has stated that:
An argument that the State failed to establish the chain of custody is a challenge to the authenticity of the evidence. Deeds v. State, 27 So.3d 1135, 1142 (Miss.2009). Rule 901 of the Mississippi Rules of Evidence states that “[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” M.R.E. 901(a). “In order for the defendant to show a break in the chain of custody, there must be an ‘indication or reasonable inference of probable tampering with the evidence or substitution of the evidence.’” Deeds, 27 So.3d at 1142 (quoting Spann v. State, 771 So.2d 883, 894 (Miss.2000)). A mere suggestion that tampering possibly could have occurred does not satisfy the defendant’s burden. Id. This Court reviews a trial court’s admission or exclusion of evidence for abuse of discretion. Ellis v. State, 934 So.2d 1000, 1004 (Miss.2006).
Hughes v. State, 90 So.3d 613, 630-31 (Miss.2012). Further, the State need not produce every person who has handled the evidence. Deeds, 27 So.3d at 1142.
¶ 87. We find no abuse of discretion in the trial court’s decision to admit the bullets. Investigator Mills provided the court with an explanation of the transfer of the bullets from the medical examiner’s office to the crime lab. No indication or reasonable inference of substitution or tampering with the bullets arose from the statements of Investigator Mills, and Corrothers’s argument took issue only with the fact the medical examiner did not testify; he did not point to anything that indicated tampering or substitution. The trial court limited Investigator Mills’s testimony about the bullets to facts within his personal knowledge. This issue is without merit.

D. Hutchins’s testimony

¶ 88. The State called Hutchins as a witness to testify to the conversation she overheard between Corrothers and Holmes. Corrothers lodged a hearsay objection. He argued that “it’s one thing if Mrs. Hutchins is here to testify to something that she alleges my client said but it’s ... another thing if she claims to testify about what some other person said.” The trial court agreed and allowed Hutchins to testify to statements by herself or Corrothers, but not statements by Holmes.
¶ 89. Hutchins testified that, on the Monday following the crimes, Corrothers visited her boyfriend, Holmes, at her mother’s house. She stated that she did not remember exactly what Corrothers had said, but she understood that he had killed some people. She testified that she called Holmes to the back of the house and “asked him did I hear what I just think I heard and he said, yes,” to which the trial *313 court sustained Corrothers’s objection. The trial judge cautioned Hutchins that she “can only say what [she] said and what Caleb Carrothers said but don’t say what others said.” But during Corrothers’s cross-examination of Hutchins, she again referred to what Holmes said to her, testifying that she heard Holmes say, “man please tell me you didn’t do that.”
¶ 90. Corrothers argues that the trial court erred in permitting Hutchins to testify as to what she understood from overhearing the conversation. He also asserts that Hutchins’s testimony constituted hearsay in violation of his right to confrontation under the Sixth Amendment. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), held that the Confrontation Clause prohibits testimonial statements by a "witness who did not appear at trial unless the witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination. Id. at 53-54,124 S.Ct. at 1365.
¶ 91. Under Mississippi Rule of Evidence 801(d)(2), an admission by a party-opponent is not hearsay. Therefore, the trial court properly allowed Hutchins’s testimony as to what Corrothers communicated. Because the Confrontation Clause “does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted,” no Confrontation-Clause violation arose from that testimony. Crawford, 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 2081-82, 85 L.Ed.2d 425 (1985)). Corrothers correctly argued at trial that anything Holmes told Hutchins would be inadmissible hearsay unless an exception applied. But the trial judge properly sustained Cor-rothers’s objection and limited Hutchins’s testimony to statements made by herself or Corrothers. Hutchins did relay another statement by Holmes, but she gave that statement in response to cross-examination elicited by the defense, and Corrothers did not object on hearsay or Confrontation-Clause grounds or request that the jury be instructed to disregard her testimony. The trial court did not abuse its discretion concerning the testimony of Hutchins.

E. Audio recording of Corrothers’s interrogation

¶ 92. In his pro se supplemental brief, Corrothers argues that the trial court committed plain error by allowing the jury to hear only half of his recorded statement, which he claims was prejudicial and a violation of his Fifth and Sixth Amendment rights. At trial, the State played a portion of the audio recording of the interrogation of Corrothers by Investigator Mills. After listening for approximately an hour, the trial court gave the jury a short recess. Upon returning, the State told the trial judge that they were not going to play the remainder of the recording, “because basically that’s all the State wanted to get in at this point.” Corrothers did not object to the failure to play the remainder of the recording.
¶ 93. Notwithstanding the procedural bar, these issues are without merit. Corrothers argues that his right of confrontation was violated by the failure to play the entirety of the recording and that Investigator Mills “changed his words” when summarizing the contents of the recording. This argument is without merit, because Corrothers was afforded substantial opportunity to confront and cross-examine Investigator Mills during his trial testimony. Corrothers also argues that the trial court committed a Brady violation. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (establishing the principle that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment). But the prose *314 cution did not suppress evidence, because the recording was made available to the defense. We note that nothing suggests the trial court would have prevented Cor-rothers from playing the remainder of the recording if he so requested.

F. Investigator Mills’s testimony and chain of custody

¶ 94. The final issue raised by Corroth-ers in his pro se supplemental brief is whether the State committed “manifest constitutional error” by allowing Investigator Mills to testify. Corrothers alleges that Investigator Mills’s “credibility violates the chain of custody in the series of the investigation” and affects the State’s theory of the case. “The Court has previously held that where a prisoner is proceeding pro se, we will take that into account and, in our discretion, credit not so well pleaded allegations so that a prisoner’s meritorious complaint may not be lost because inartfully drafted.” Ivy v. Merchant, 666 So.2d 445, 449 (Miss.1995) (citing Moore v. Ruth, 556 So.2d 1059, 1061 (Miss.1990)). With that said, many of Cor-rothers’s arguments on this issue appear incomplete or tenuously connected.
¶ 95. First, Corrothers argues that Investigator Mills made false statements about not knowing that Josh had memory problems. This argument is not further developed. Investigator Mills’s statements were consistent with the previous analysis concerning Josh’s memory problems, and Corrothers was afforded substantial opportunity to cross-examine Mills. This argument is without merit.
¶ 96. Next, Corrothers gives a lengthy account of how Officer Jason Butts, part of the first-response team, wrote a report roughly an hour after the crime took place, in which he reported statements made by Josh. Several of these statements were inconsistent with Tonya’s testimony at trial. For example, Josh said that Frank came out of the bedroom with his rifle, but Tonya testified that she saw the killer go into the bedroom and retrieve it. Josh stated the killer kicked in the door and then shot Frank, while Tonya testified these events occurred in the opposite order. While Corrothers’s individual statements are true, it is unclear how there was a “clear violation” of the United States Constitution. Corrothers could have used the inconsistencies to impeach the witnesses at trial, but he failed to do so despite extensive cross-examination of these witnesses. This issue is without merit.
¶ 97. Third, Corrothers argues that Investigator Mills fabricated statements in his request for a search warrant in order to establish probable cause for the warrant. The “underlying facts and circumstances” sheet written to obtain the search warrant and dated July 17, 2009, stated that Corrothers was identified by the witnesses, referring to Tonya and Josh. However, only Josh was able to identify Corrothers in the photo lineup given the day before. While Corrothers is correct that Investigator Mills incorrectly stated Tonya also had identified Corroth-ers, probable cause for a search warrant still existed without Tonya’s identification. “[P]robable cause exists when the facts and circumstances within an officer’s knowledge are ‘sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.’ ” Roach v. State, 7 So.3d 911, 917 (Miss.2009).
¶ 98. Next, Corrothers contends that possible exculpatory evidence was misplaced or purposefully destroyed, including a t-shirt with possible blood spots on it. Corrothers references a motion he filed under Mississippi Rule of Appellate Procedure 10(e) to correct the record to include several items, including the “cell phone and T-shirt confiscated in search *315 [warrant].” However, that motion was denied, and nothing in the record suggests Taylor’s cell phone ever was found. When law-enforcement officers searched Cor-rothers’s mother’s house, they were unable to find the clothes he said he was wearing that night. Nothing in the record indicates that law-enforcement officers ever found Corrothers’s t-shirt or Taylor’s cell phone. Mississippi Rule of Appellate Procedure 10(e) is not a vehicle for admitting new evidence into the record, a role generally reserved for the trial court; rather, Rule 10(e) is a method for correcting the appellate record to reflect what occurred in the trial court. M.R.A.P. 10(e). This issue is without merit.
¶ 99. Corrothers also reiterates several arguments he has made elsewhere in this appeal, including that he was prejudiced by the admission of Tonya’s 911 call, that the trial court erroneously refused his jury instructions on his theory of the ease, and that the trial court erroneously excluded the audio statement of Josh taken by Douglas. We have addressed these arguments in this opinion and have found them to be without merit. Finally, Corrothers makes a lengthy factual argument that it is not possible to hide from a K-9 unit in the woods for roughly five hours in the middle of the night. This factual argument was for the jury, and Corrothers fails to show how the trial court erred. This issue is without merit.
VI. WHETHER CORROTHERS’S SENTENCE MUST BE VACATED BECAUSE OF THE TRIAL COURT’S FAILURE TO ADEQUATELY INSTRUCT THE JURY BEFORE THE OVERNIGHT BREAK BETWEEN THE VERDICT OF GUILT AND THE SENTENCING PHASE PROCEEDINGS.
¶ 100. Corrothers argues that the trial court erred in failing to instruct the jury before its overnight break between the guilt and sentencing phases of the trial. “Jurors must not ‘discuss a case among themselves until all the evidence has been presented, counsel have made final grounds, and the case has been submitted to them after final instructions by the trial court.’” Holland v. State, 587 So.2d 848, 873 (Miss.1991) (quoting State v. Washington, 182 Conn. 419, 438 A.2d 1144, 1147 (1980)). “It is, of course, the duty of the trial judge to direct the activity of the juries, the lawyers, and the litigants. No person can perform this duty other than the judge.” Roberson v. State, 257 So.2d 505, 508 (Miss.1972).
¶ 101. Corrothers concedes that, throughout the trial, the jury was properly instructed at each break not to discuss the case among themselves or with anyone else, as well as being given other various admonishments. But Corrothers argues that such instructions were not given at the crucial time between the end of the guilt phase and the beginning of the sentencing phase. The next morning, the trial judge gave the jury such instructions in great detail. Corrothers argues, however, that the damage had been done at that point because the jury had the entire overnight break during which they had not been cautioned by the court. Corrothers failed to raise an objection at trial or ask the court to reinstruct the jury before they retired in the evening.
¶ 102. This issue is procedurally barred because Corrothers failed to make a contemporaneous objection. Moawad v. State, 531 So.2d 632, 634 (Miss.1988). Procedural bar notwithstanding, Corrothers provides no authority for his claim that cautionary instructions must be given to the jury before each break. While Cor-rothers is correct that, ideally, the jury *316 should be instructed before each break not to discuss the case among themselves or with others, he cites no authority that such instructions must be given before each break. Mississippi statutes are silent on the topic of jury instructions in death-penalty cases, stating only that “[t]he proceeding shall be conducted by the trial judge before the trial jury as soon as practicable.” Miss.Code Ann. § 99-19-101(1) (Rev.2007). As Corrothers has conceded, the jury was instructed appropriately at various other breaks before the overnight break between the guilt and sentencing phases of the trial. Concerning formal jury instructions on the law, “[t]his Court has held on numerous occasions that when a trial court instructs the jury, it is presumed the jurors follow the instructions of the court.” Moffett v. State, 49 So.3d 1073, 1108 (quoting Williams v. State, 684 So.2d 1179, 1209 (Miss.1996)). Here, the jury was cautioned repeatedly by the trial judge and warned at the beginning of the sentencing phase, and the jury is presumed to have followed the instructions of the trial court. Corrothers does not point to any evidence that the jury deliberated prematurely. Therefore, notwithstanding the procedural bar, the issue is without merit.
VII. WHETHER CORROTHERS’S SENTENCE MUST BE VACATED BECAUSE THE STATE PRESENTED VICTIM IMPACT TESTIMONY IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.
¶ 103. Next, Corrothers argues that the trial court erred in allowing Tonya to present victim-impact testimony in violation of the Eighth and Fourteenth Amendments to the Constitution. He argues that this Court should revisit its adherence to Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), or, alternatively, that Tonya’s testimony about the impact of the loss of her husband and son exceeded the permissible scope of victim-impact testimony.
¶ 104. Corrothers argues that he preserved this issue by filing a pretrial motion to preclude the victim-impact testimony. The motion concerned the use of victim-impact testimony at both the guilt and sentencing phases of the trial. Cor-rothers brought the motion to the court’s attention at a pretrial-motions hearing, stating “[t]he next is a motion to preclude the State from introducing victim’s impact evidence in the guilt phase of the trial....” The State responded that it did not intend to use victim-impact evidence during the guilt phase, but only at sentencing. The trial court stated “[a]ll right,” and Corrothers proceeded to his next motion. These proceedings reveal that, while Corrothers did file a pretrial motion to preclude the use of victim-impact testimony at sentencing, he did not secure a ruling from the trial court on the use of victim-impact testimony at sentencing. And he did not lodge a contemporaneous objection when the State sought to admit the testimony at sentencing. Corrothers’s failure to secure a ruling from the trial court and subsequent failure to object contemporaneously waived this issue for appeal. King v. State, 960 So.2d 413, 438 (Miss.2007); Grayson v. State, 806 So.2d 241, 254-55 (Miss.2001) (quoting Johnson v. State, 461 So.2d 1288, 1290 (Miss.1984) (stating that [t]he movant bears the responsibility of obtaining a ruling from the court on a motion filed by him and his failure to secure such a ruling constitutes waiver)).
¶ 105. Notwithstanding the procedural bar, we briefly address this issue. The Court adopted the rule of Payne v. Tennessee in Hansen v. State, writing:
*317 [Tjhere is no bar in federal law to our allowing prosecutors to produce for the jury “at the sentencing phase evidence of the specific harm caused by the defendant. ... A state may legitimately conclude that evidence about the victim and about the impact of the murder or the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed.”
Hansen v. State, 592 So.2d 114, 146 (Miss.1991) (quoting Payne, 501 U.S. at 825, 827, 111 S.Ct. 2597). Tonya’s testimony falls squarely within the definition provided in Payne as to what constitutes admissible victim-impact evidence. While Corrothers argues the testimony was inadmissible because it was not related to any of the statutory aggravators, this Court allows victim-impact testimony in as narrow circumstances as constitutionally permissible “[w]hen the evidence is proper, necessary to a development of the case and the true characteristics of the victim, and could not incite the jury.” Batiste v. State, 121 So.3d 808, 864 (Miss.2013) (citing Havard v. State, 928 So.2d 771, 792 (Miss.2006)). We note that Corrothers makes no argument that any of Tonya’s specific statements were unfairly prejudicial or otherwise inadmissible; he simply argues that the entirety of her victim-impact testimony was inadmissible. The trial court, following the rule in Payne, properly allowed her victim-impact testimony, which was similar to what has been allowed in other cases. See, e.g., Batiste, 121 So.3d at 864-65. This issue is procedurally barred; notwithstanding the procedural bar, it is without merit.
VIII. WHETHER THE TRIAL COURT ERRED IN REFUSING CORROTHERS’S PROPOSED PENALTY-PHASE INSTRUCTIONS.
¶ 106. Corrothers argues the trial court erred in refusing several of his proposed penalty-phase instructions, including D-23, D-25, and D-17. Corrothers also argues that it was plain error to instruct the jury that the Mississippi sentencing statute permitted it to impose a death sentence if mitigation did not outweigh aggravation. As stated previously concerning guilt-phase instructions, a “trial judge is under no obligation to grant redundant instructions. The refusal to grant an instruction which is similar to one already given does not constitute reversible error.” Montana v. State, 822 So.2d 954, 961 (Miss.2002) (citations omitted).

A. Proposed instruction D-23

¶ 107. Corrothers’s proposed instruction D-23 read: “If you fail to reach a verdict as to penalty this will not affect the verdict you have already returned at the guilt trial. This means that even if you do not reach an agreement as to sentence, Mr. Corrothers will be sentenced to life imprisonment without the possibility of parole.” Corrothers argues that, without this instruction, the jury was not informed that a hung jury would not result in a new trial but would result in a life-without-parole sentence.
¶ 108. This Court dealt with this argument in Gillett v. State, 56 So.3d 469, 516 (Miss.2010). The defendant in Gillett requested an instruction that, in substance, was identical to that requested by Corrothers. Id. Applying the rule that jury instructions are to be read as a whole, we found that the failure to grant the instruction was not reversible error. As in this case, Gillett’s jury had been instructed that the three sentencing options were death, life imprisonment, and life without the possibility of parole, and that one possible verdict it could return was that the jury was unable to agree unanimously on *318 punishment. Id. We find that, under Gil-lett, no reversible error resulted from the failure to grant the instruction.

B. Proposed instruction D-25

¶ 109. Proposed instruction D-25 read: “We emphasize that the procedure you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances, rather, each individual juror must apply a reasoned moral judgement [sic] as to whether this case calls for life imprisonment or whether death is the only appropriate punishment.” The trial court refused D-25, stating that it was “covered adequately in S 3.” Instruction S-3 read:
The Court instructs the jury that it must be emphasized that the procedure that you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present.
Instruction S-3 was largely the same as proposed instruction D-25; in fact, the first half is almost identical. Jury instructions that are redundant need not be given. Montana, 822 So.2d at 961. The Court has applied the redundancy rule to a request for an instruction that specifically refers to “individual” jurors. Fulgham v. State, 46 So.3d 315, 328 (Miss.2010). Accordingly, the trial court did not err in excluding D-25.

C. Proposed instruction D-17

¶ 110. Corrothers’s proposed instruction D-17 read: “You may impose a sentence of life imprisonment for any reason or for no reason at all.” Corrothers states that he relied on the principle that defendants are under no obligation to put on any mitigating evidence when he proposed D-17. The trial court agreed with that principle but found that D-17 was duplicative of given instruction D-19, which read:
As each of you is free to consider any other matter which you may deem to be mitigating on behalf of Mr. Corrothers in reaching your sentencing decision, and as each of you maintains the option to sentence Mr. Corrothers to life imprisonment whatever findings you make, I instruct you as follows: you need not unanimously determine that a death sentence is inappropriate in this matter before you move on to consider a sentence less than death. Each one of you is allowed to give due consideration to whatever factors you find which call for a sentence less than death.
¶ 111. First, the proposed instruction, D-17, is akin to a “mercy” instruction. See Foster v. State, 639 So.2d 1263, 1300 (Miss.1994). Defendants do not have a right to a mercy instruction. Saffle v. Parks, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). “In Saffle, the United States Supreme Court stated that the giving of a mercy instruction results in a decision based on whim and caprice.” Ladner v. State, 584 So.2d 743, 761 (Miss.1991). Second, the proposed instruction is redundant in light of instruction D-19, which actually provides much more detail than proposed instruction D-17. For these reasons, the trial court did not err in refusing D-17.

D.Plain error

¶ 112. In addition to the proposed jury instructions specifically appealed, Corrothers asserts that it was error for the trial court to instruct the jury that the Mississippi sentencing statute permitted it to impose a death sentence if mitigation *319 did not outweigh aggravation. Because Corrothers did not object to this instruction, he attempts to raise the issue as plain error. “The plain error doctrine requires not only the existence of an error, but also that either the error resulted in a manifest miscarriage of justice or ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ ” Brown v. State, 995 So.2d 698, 703 (Miss.2008) (citation omitted). The Court applies the plain-error rule only when the error affects a defendant’s fundamental rights. Id.
¶ 113. With this argument, Corrothers contends that Mississippi law unconstitutionally permits a “tie” to go to death. This Court addressed this argument in Batiste. Batiste, 121 So.3d at 866. We observed that, in Kansas v. Marsh, 548 U.S. 163, 173, 126 S.Ct. 2516, 2524, 165 L.Ed.2d 429 (2006), the United States Supreme Court held that “Kansas’ death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise.” Batiste, 121 So.3d at 866 (quoting Marsh, 548 U.S. at 173, 126 S.Ct. 2516). Therefore, we found no error in a jury instruction stating that death could be imposed if mitigation did not outweigh aggravation. Id. Because no error occurred, we do not recognize plain error.
IX. WHETHER ALL OF THE AGGRAVATING CIRCUMSTANCES ON WHICH THE JURY WAS INSTRUCTED WERE EITHER LEGALLY OR FACTUALLY UNSUPPORTED, AND CORROTHERS’S DEATH SENTENCE IS THEREFORE INVALID.
¶ 114. On both counts of murder, the jury instructions directed the jury to consider four statutory aggravating circumstances, any one of which was required to support a sentence of death. See Miss. Code Ann. § 99-19-101(5) (Rev.2007). Specifically, the jury was asked to consider: (1) whether the defendant committed the capital offense while under sentence of imprisonment; (2) whether the defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person; (3) whether the defendant knowingly created a great risk of death of many persons; and (4) whether the capital offense was committed while the defendant was engaged in the commission of a robbery. The jury found that all four aggravating circumstances existed as to both capital-murder convictions and imposed sentences of death. Corrothers raises several subis-sues, which are addressed in the order raised.
¶ 115. First, Corrothers argues it was error to instruct the jury to consider as two separate aggravating circumstances that the defendant previously had been convicted of a violent felony and that he had committed the capital crime under a sentence of imprisonment. These two aggravating circumstances are listed separately in Mississippi Code Section 99-19-101(5). Historically, juries have been allowed to consider these facts as two separate aggravating circumstances. See Galloway v. State, 122 So.3d 614, 654 (Miss.2013). While Corrothers argues that the crime used to establish the “previous violent felony” aggravator cannot also be used to establish the “under a sentence of imprisonment” aggravator, this Court repeatedly has held the opposite. Hughes v. State, 735 So.2d 238, 277-78 (Miss.1999); Blue v. State, 674 So.2d 1184, 1219-20 (Miss.1996) (overruled on other grounds); Taylor v. State, 672 So.2d 1246, 1276 (Miss.1996). This issue is without merit.
*320 ¶ 116. Second, Corrothers alleges the trial court erred in instructing the jury that it could consider the fact that the capital murders were committed in the course of a robbery as an aggravating circumstance in sentencing him to death. Such a situation, known as “doubling,” refers “to situations where a crime such as robbery is used both as the underlying felony to support a capital murder charge and as an aggravating circumstance to support the imposition of a death sentence.” Davis v. State, 684 So.2d 648, 663 n. 6 (Miss.1996). This Court has held “that the alleged felony underlying the capital-murder conviction may properly be used as an aggravator....” Gillett, 56 So.Bd at 510 (quoting Ross v. State, 954 So.2d 968, 1014 (Miss.2007)). “The United States Supreme Court has held that use of an underlying felony as an aggravator is not a constitutional error.” Moffett v. State, 49 So.3d 1073, 1116 (Miss.2010) (citing Tuilaepa v. California, 512 U.S. 967, 971-72, 114 S.Ct. 2630, 2634-35, 129 L.Ed.2d 750 (1994); Lowenfield v. Phelps, 484 U.S. 231, 233, 108 S.Ct. 546, 548, 98 L.Ed.2d 568 (1988)). Accordingly, Corrothers’s argument fails.
¶ 117. Corrothers also argues that, under the circumstances of his case, it was unconstitutional to instruct the jury on the “great risk of death of many persons” aggravating circumstance. First, he reiterates his “doubling” argument, which is without merit for the reasons recited above. Second, he argues that the use of the “great risk of death” aggravator in conjunction with his conviction of aggravated assault “runs afoul of the double jeopardy clause of the state and federal constitutions.” See Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Rowland v. State, 98 So.3d 1032,1037 (Miss.2012).
¶ 118. The Court has held that the use of the “great risk of death” aggra-vator in these circumstances does not violate the double-jeopardy clause. See Flowers v. State, 842 So.2d 531, 561-62 (Miss.2003).
[C]onsideration of other crimes at sentencing does not implicate the Double Jeopardy Clause because the defendant is not actually being punished for the crimes so considered. Rather, the other crimes aggravate his guilt of, and justify heavier punishment for, the specific crime for which defendant has just been convicted. See United States v. Bowdach, 561 F.2d 1160, 1175 (5th Cir.1977) (rejecting virtually identical double jeopardy argument).
Flowers, 842 So.2d at 561-62 (¶ 94) (quoting Wilcher v. State, 697 So.2d 1087, 1105 (Miss.1997) (quoting Sekou v. Blackburn, 796 F.2d 108, 112 (5th Cir.1986))). To use the “great risk of death” aggravator, the risk must be to one other than the intended victim. Id. In this case, instruction on the “great risk of death” aggravator was proper because evidence showed Corroth-ers entered the home intending to attack Taylor, and in doing so, he shot Frank and Tonya and held a gun on Josh. The jury properly was instructed on this aggravating circumstance.
¶ 119. Finally, Corrothers argues that, even if only one of the aggravating circumstances instructed upon is found to be invalid, the Sixth Amendment requires that he be afforded a new sentencing hearing before a jury. Because all four of aggravators instructed upon were valid, this argument is moot.
X. WHETHER THE DEATH SENTENCE IN THIS CASE MUST BE VACATED BECAUSE IT WAS IMPOSED IN VIOLATION OF THE CONSTITUTION OF THE UNITED STATES.
¶ 120. Next, Corrothers asserts four subissues, arguing Mississippi’s death pen *321 alty is unconstitutional because (a) the failure to include the aggravating circumstances in the indictment renders the sentence unconstitutional; (b) the scienter provisions of the Mississippi capital-sentencing statute are unconstitutional; (c) the Mississippi death penalty is unconstitutional for other reasons, including its discriminatory impact; and (d) execution by lethal injection will violate Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).

A. Failure to include aggravating circumstances in the indictment

¶ 121. Corrothers’s first argument is that, because the aggravating circumstances used as grounds for his death sentence were not included in the indictment, his conviction must be reversed. He asserts that the United States Supreme Court decisions of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), require the inclusion of aggravating circumstances in the indictment. He argues that, because the indictment omitted the aggravating circumstances, it did not set forth all of the elements necessary to impose the death penalty in violation of his right to due process under the Fifth and Fourteenth Amendments and his right to notice and a jury trial under the Sixth and Fourteenth Amendments.
¶ 122. Apprendi held that, “under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.” Apprendi, 530 U.S at 476, 120 S.Ct. at 2355. Ring held that, because, under Arizona’s sentencing scheme, aggravating factors operated as “ ‘the functional equivalent of an element of a greater offense,’ the Sixth Amendment requires that they be found by a jury.” Ring, 536 U.S. at 609, 122 S.Ct. at 2443 (quoting Appren-di, 530 U.S. at 494 n. 19, 120 S.Ct. 2348).
¶ 123. This Court has held that Appren-di and Ring do not invalidate our capital-murder sentencing scheme. Berry v. State, 882 So.2d 157, 172 (Miss.2004). We have further held that
Apprendi’s statement that any fact that increases the maximum penalty must be charged in an indictment relates to the Sixth Amendment right to a jury trial, not to requirements for an indictment. Havard v. State, 928 So.2d 771, 801 (Miss.2006). Neither Apprendi nor Ring addressed state indictments. See Berry v. State, 882 So.2d at 170. We have held that “these cases ... address issues wholly distinct from our law, and do not address indictments at all.” Brown v. State, 890 So.2d 901, 918 (Miss.2004) (citing Stevens v. State, 867 So.2d 219 (Miss.2003)).
Batiste, 121 So.3d at 871. Accordingly, Apprendi and Ring did not require the inclusion of aggravating circumstances in Corrothers’s indictment.
¶ 124. Moreover, “[w]hen [Corrothers] was charged with capital murder, he was put on notice that the death penalty might result, what aggravating factors might be used, and the mens rea standard that was required.” See Goff v. State, 14 So.3d 625, 665 (Miss.2009). “The State is correct in its assertion that a defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution and that an indictment for capital murder puts a defendant on sufficient notice to what statutory aggravating factors will be used against him.” Brawner v. State, 947 So.2d *322 254, 265 (Miss.2006). The Court in Brawner further stated:
Accordingly, all that is required in the indictment is a clear and concise statement of the elements of the crime charged. Our death penalty clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. Thus, every time an individual is charged with capital murder they are put on notice that the death penalty may result.
Id. at 265 (citing Brown v. State, 890 So.2d 901, 918 (Miss.2004)).
¶ 125. Finally, Corrothers argues that Mississippi’s capital-sentencing scheme is indistinguishable from that in Kansas v. Marsh, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), and, therefore, the position that Ring v. Arizona has no application to Mississippi’s scheme is incorrect. We rejected this argument in Batiste, holding that, because Marsh did not address the requirements for indictments, it did not alter our interpretation of Appren-di and Ring. Batiste, 121 So.3d at 871. This issue is without merit.

B. Scienter and Mississippi’s capital-sentencing statute

¶ 126. Corrothers’s next argument is that, pursuant to Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the United States Supreme Court requires that to be sentenced to death, a person convicted of capital murder must have actually killed, attempted to kill, or intended to kill. Corrothers argues that Mississippi unconstitutionally adds a fourth basis-that the defendant “contemplated lethal force would be employed.” Miss.Code Ann. § 99-19-101(7)(d) (Rev.2007). “This Court has repeatedly held that ‘Mississippi’s capital sentencing scheme, as a whole, is constitutional.’” Stevens v. State, 806 So.2d 1031, 1052 (¶ 92) (Miss.2001) (quoting Woodward v. State, 726 So.2d 524, 528 (Miss.1997)). “The State must only prove one of the four facts. It is not necessary that the State prove intent where the victim was actually killed.” Id. at 1053 (¶ 99). Here, the trial court properly instructed the jury as to the findings necessary to impose a sentence of death based on state law. According to precedent, Mississippi’s capital-sentencing scheme is constitutional. Therefore, this issue is without merit.

C. Other reasons for unconstitutionality

¶ 127. Corrothers asserts that other reasons mandate that our death-penalty statutes be held unconstitutional, including that the death-penalty scheme discriminates in violation of the Fourteenth Amendment. The Court previously has addressed Mississippi’s death-penalty scheme in relation to discrimination:
Lastly, Galloway claims Mississippi’s death-penalty scheme is applied in a discriminatory and irrational manner in violation of the of the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment and corresponding clauses of the Mississippi Constitution. The United States Supreme Court rejected an almost identical argument in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). There, Warren McCleskey argued that Georgia’s capital-punishment statute violated equal protection, based upon a study showing that black defendants were more likely to be sentenced to death than white defendants, and defendants murdering whites were more likely to be sentenced to death than defendants who murdered blacks. Id. at 291-92, 107 S.Ct. 1756. *323 The Court held that, in order to raise a successful claim of an equal-protection violation, the criminal defendant must prove that “the decisionmakers in his case acted with discriminatory purpose.” Id. at 292, 107 S.Ct. 1756. McCleskey’s only proof supporting his claim was the results of the study. The Court determined that, due to the number of variables inherent in capital sentencing and the discretion allowed trial courts in implementing criminal justice, the use of statistical evidence was insufficient to prove purposeful discrimination. Id. at 292-97,107 S.Ct. 1756.
Galloway v. State, 122 So.3d 614, 680-81 (Miss.2013). Like Galloway, Corrothers simply points to statistical evidence as evidence of discrimination and fails to demonstrate that the decision-makers in his case acted with a discriminatory purpose. Therefore, this argument is without merit.
¶ 128. Corrothers also argues that Mississippi’s capital-sentencing scheme is overly broad and vague, both facially and as applied to Corrothers “in permitting the jury to consider imposing the penalty based on aggravating circumstances that the murder was ‘especially atrocious, heinous or cruel.’” See Miss.Code Ann. § 99 — 19—101 (5)(h) (Rev.2007). Granting relief on this argument would require the Court to overrule substantial precedent, as we have “repeatedly held that the ‘especially heinous, atrocious or cruel’ provision of Miss.Code Ann. § 99 — 19—101(5)(h) is not so vague and overbroad as to violate the United States Constitution.” Stevens v. State, 806 So.2d 1031, 1060 (Miss.2001) (citing Mhoon v. State, 464 So.2d 77, 84 (Miss.1985) (overruled on other grounds)); see also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
¶ 129. Additionally, Corrothers argues that Mississippi’s capital-sentencing scheme is unconstitutional because it allows the jury to apply the death penalty for felony murder but not for simple murder. Once again, this argument has failed repeatedly before this Court:
[Appellant] further argues that the death-penalty scheme is unconstitutional because it does not allow the death penalty in cases of simple murder, no matter how premeditated or atrocious. We find that [Appellant] is entitled to no relief. This Court has held that “the death penalty in Mississippi does not violate the U.S. Constitution.”
Batiste, 121 So.3d at 872 (quoting Gillett v. State, 56 So.3d 469, 525 (Miss.2010)).
¶ 130. Finally, Corrothers asserts that, under Coleman v. State, 378 So.2d 640, 649 (Miss.1979), Mississippi’s capital-sentencing scheme does not require the jury to make a written record of the circumstances it considered as mitigating against imposing a sentence of death. Mississippi’s capital-sentencing statute expressly requires the jury to make “specific written findings of fact” concerning aggravating and mitigating circumstances. See Miss. Code Ann. § 99-19-101(3) (Rev.2007). Coleman held that the statute does not require detailed findings. Although Cor-rothers argues that this violates his Sixth, Eighth, and Fourteenth Amendment right to appellate review of the jury’s decision for possible arbitrariness, he cites no authority supporting his proposition that Section 99-19-101(3) is unconstitutional. The failure to cite authority waives the issue for appellate review. Gillett, 56 So.3d at 517.

D. Constitutionality of lethal injection

¶ 131. Finally, Corrothers asserts that Mississippi’s use of the lethal-injection protocol violates Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). First, Corrothers is procedurally barred *324 from raising this issue on appeal, as he failed to challenge the method of execution at trial. Batiste, 121 So.3d at 872 (citing Chamberlin v. State, 55 So.3d 1046, 1056 (Miss.2010)). Second, the Court has “held unequivocally that Mississippi’s method of lethal injection does not violate the Eighth Amendment.” Chamberlin, 55 So.3d at 1056. In Bennett v. State, the Court stated:
If differences exist between Mississippi’s execution protocols and those used in Kentucky, then, the inquiry is whether Mississippi’s lethal-injection protocol meets Constitutional muster in light of this recent Supreme Court decision. The Fifth Circuit, when considering inmate Dale Leo Bishop’s Eighth-Amendment challenge to Mississippi’s lethal-injection procedures, recently announced that “Mississippi’s lethal injection protocol appears to be substantially similar to Kentucky’s protocol that was examined in Baze.” Walker v. Epps, [287 Fed. Appx. 371, 375] 2008 WL 2796878, *3, 2008 U.S.App. LEXIS 15547, *3 (5th Cir. Miss. July 21, 2008). We agree with the Fifth Circuit’s analysis, and hold that Bennett’s Eighth Amendment challenge to the lethal injection protocol in Mississippi is without merit.
Bennett v. State, 990 So.2d 155, 161 (Miss.2008). By the same analysis, Corrothers’s argument fails.
XI. WHETHER THE DEATH SENTENCE IN THIS MATTER IS CONSTITUTIONALLY AND STATUTORILY DISPROPORTIONATE.
¶ 132. Mississippi Code Section 99-19-105 requires that this Court review the record in any case in which the death sentence is imposed and compare it with death sentences imposed in other capital-punishment cases to determine whether the sentence imposed was excessive or disproportionate to the penalty imposed in similar cases decided since Jackson v. State, 337 So.2d 1242 (Miss.1976). Nixon v. State, 533 So.2d 1078, 1102 (Miss.1987).
¶ 133. In this case, we find that “after a review of the cases coming before this Court, and comparing them to the present case, the punishment of death is not too great when the aggravating and mitigating circumstances are weighed against each other and the death penalty will not wantonly or freakishly be imposed here.” Nixon, 533 So.2d at 1102. The Court has repeatedly “upheld the death penalty in cases involving capital murders committed during the commission of a robbery.” Batiste, 121 So.3d at 873 (citing Gillett, 56 So.3d at 524; Fulgham, 46 So.3d at 323; Goff, 14 So.3d at 650; Chamberlin, 989 So.2d at 345; Doss v. State, 709 So.2d 369, 401 (Miss.1997)). Likewise, we repeatedly have upheld the death penalty in cases involving multiple capital murders. See Brawner v. State, 872 So.2d 1, 17 (Miss.2004); Stevens v. State, 806 So.2d 1031, 1064 (Miss.2001); Manning v. State, 765 So.2d 516, 522 (Miss.2000); McGilberry v. State, 741 So.2d 894, 925 (Miss.1999); Brown v. State, 690 So.2d 276, 298 (Miss.1996); Jackson v. State, 684 So.2d 1213, 1240 (Miss.1996). Because the punishment in the instant case is commensurate with punishments imposed in a litany of similar cases, this issue is without merit.
XII. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS IN THE TRIAL COURT MANDATES REVERSAL OF THE VERDICT OF GUILT OR THE SENTENCE OF DEATH ENTERED PURSUANT TO IT.
¶ 134. Corrothers argues that the cumulative effect of the errors in this case deprived him of a fair trial and mandates reversal. Under the cumulative-er *325 ror doctrine, even if any specific error is insufficient for reversal, we may reverse if the cumulative effect of all the errors deprived the defendant of a fundamentally fair trial. Ross v. State, 954 So.2d 968, 1018 (Miss.2007). But where no error has occurred, there can be no cumulative error. Because we have found that no error occurred at Corrothers’s trial, there can be no cumulative error, and this issue is without merit.
CONCLUSION
¶ 135. We affirm Corrothers’s convictions and sentences.
¶ 136. COUNT I — CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT II — CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED. COUNT III — CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AS A HABITUAL OFFENDER, WITHOUT THE POSSIBILITY OF PAROLE AND SENTENCE SHALL NOT BE REDUCED OR SUSPENDED NOR SHALL APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION OR EARLY RELEASE, AFFIRMED.
WALLER, C.J., LAMAR AND PIERCE, JJ., CONCUR. RANDOLPH, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.; LAMAR AND CHANDLER, JJ., JOIN IN PART.
KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; KITCHENS AND KING, JJ., JOIN IN PART.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. At the time of the shooting, Corrothers had been on parole for just over a month for a 1999 armed-robbery conviction.

. The exact nature of Josh’s brain injury was never established.